Filed 9/11/15

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061954 |
| v. | (Super.Ct.No. FVI1201671) |
| MILAD SHENOUDA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

_____

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part IIA.

A jury convicted defendant and appellant, Milad Anis Shenouda, of committing a lewd act upon Brianna W., a 13-year-old girl.[1]  (Pen. Code, § 288, subd. (a), count 3.)[2]  The jury acquitted defendant of the charge that he committed felony child molestation against Brianna.  (§ 647.6, subd. (b), count 5.)  The jury also acquitted defendant of charges that he committed sexual battery (§ 243.4, subd. (e)(1), count 4) and sexual battery by restraint (§ 243.4, subd. (a), count 1) against Teri W., Brianna's mother, and acquitted him of the charge of first degree burglary (§§ 459, 460, subd. (a), count 2).  The trial court denied probation and sentenced defendant to the statutory middle term of six years in state prison.

Defendant appeals his conviction on the ground that the prosecution failed to present substantial evidence that he touched the victim "with the specific intent of obtaining sexual arousal or gratification."  Defendant also appeals the trial court's decisions to deny probation and sentence defendant to the middle term of six years in prison on the ground the court improperly relied on findings that defendant lacked remorse and had committed sexual offenses against Teri and other women who testified at trial under Evidence Code section 1108.

For the reasons explained *post*, we affirm the judgment and the sentence.

---

[1]     To maintain privacy, we follow the trial court's convention of using first names or first names and first initials of surnames to refer to the people who accused defendant of committing sexual offenses as well as to members of their families.

[2]     All further unlabeled statutory references are to the Penal Code.

# I

# FACTUAL BACKGROUND

Teri and her family have lived in the same house in Apple Valley since 1993. In June 2012, when the events that sparked this case occurred, she lived in the house with her husband, Robert, and their teenage daughters, Amanda, Danielle, and Brianna. Brianna was born in 1998 and was 13 years old at the time.

Defendant worked as a letter carrier in Apple Valley, delivering mail for the United States Post Office. By 2012 he had worked for the post office for 28 years. Defendant testified that he began the route that included the home of Teri and her family in early 1998, the year Teri was pregnant with Brianna. The mailbox for Teri's house is located about a half mile away, in a centralized bank of approximately 200 mailboxes. Defendant's usual practice was to deliver mail to the centralized mailboxes, but to go to individual homes when he had a package that would not fit in the mailbox or in one of the limited number of package lockers. Teri testified, however, that defendant often delivered regular mail directly to her house.

Everyone agreed that, for many years, defendant had a friendly relationship with Teri and her family. Teri and her family knew defendant by his nickname, Rocky. Teri testified that defendant would deliver mail to her house and they would exchange "a, hey, how are you doing, friendly hi." Candace Fry, who described herself as Teri's neighbor and "pretty much a best friend of hers for close to 20 years" and who also served as Brianna's nanny, testified that defendant and Teri were "[v]ery friendly; they get along

3

really good." She testified that "[w]e'd be at her mailboxes, and she'd sit there and talk to him forever. Her daughters would hug him; just real friendly, real happy." She had seen all three of Teri's daughters initiate hugs with defendant, but never saw defendant initiate contact with the girls. According to Fry, "Brianna really liked Rocky." Fry said if Brianna was at the mailboxes when Rocky was there, "she'd run and say hi and hug him." Defendant testified that Brianna was a "child that I've known over the years since before she was born. So she was like a child of mine." Teri's husband, Robert, "would be there a lot of times at the house. We stand and talk if I have a package to them to deliver." On one occasion, Robert sold him a car tire for use on his motorcycle and asked defendant to "bring it by so I can see it." When defendant brought the motorcycle by their house, Robert, Teri, and Brianna inspected the bike and defendant took Brianna for a ride around the neighborhood. According to Brianna, her father suggested she take a ride and she agreed. On another occasion, Teri showed defendant the remodeling work in her master bathroom. On a third occasion, she showed him kittens she was housing in her bedroom closet and he adopted two of them. On a fourth occasion, she showed him the inside of the family's recreational vehicle. Amanda testified that on another occasion Teri showed him the waterbed in her bedroom, though Teri denied this occurred.

According to Teri, their relationship changed in 2008, when defendant began coming into her house uninvited to deliver the mail. At first, he would drop the mail off "in the chair on the porch, knock on the door and . . . then it just progressed from that, and he would just walk in my house unannounced." Around the same time, defendant

4

started "making advances towards me saying things, just little comments here and there. And then it progressed from there." The first time Teri remembers defendant touching her in a sexual manner occurred at the centralized mailboxes where she often waited for Brianna to return after school. Teri recounted that she was sitting in "my car, and he reached in my car and grabbed me" she testified, gesturing to her left breast. Another time at the same location, defendant "stuck his head in my window and kissed me." Teri testified that she did not want to make a big deal about these unwanted attentions because she "didn't want him to lose his job." Between these events and June 2012, Teri testified that defendant touched and kissed her "[t]oo many [times] to count" and estimated their frequency at "once or twice a week." He touched her inappropriately at the central mailboxes a "couple other times," and also began touching and kissing her without her consent when he came in her house to deliver her mail. On one such occasion, defendant came in her front door, tried to hug her, touched her breast, and "put his hand down the back of my pants." Teri told him to stop and he backed away. Teri testified that these unwanted attentions made her feel like she "wanted to crawl underneath a rock," but she "just didn't know what to do." She asked defendant to stop "[m]any, many times" without success.

Things finally reached a head in June 2012. On June 7, defendant "[w]alked in [her] front door" uninvited, though Teri had asked him not to do that anymore. Defendant put the mail on the kitchen table and then "asked [Teri] if [she] wanted to play." Teri said no, but defendant "pulled my hand. I was standing in front of him, and

5

he pulled my hand backwards onto his front of his pants" and forced her to touch his crotch. Teri pulled away and "told him [she] was getting ready to go to a doctor's appointment." She tried "to get him to leave, and he wouldn't." Instead "[h]e sat on my chair, my kitchen table, and he grabbed me as I walked by him. . . . And he pulled me towards him and held me tight and wouldn't let go." Defendant held Teri pressed against him face to face with her stomach pressed against his crotch. She could feel he was sexually aroused. While he was holding her, defendant reached a hand down her shirt to grab her breasts, tried to kiss her on the mouth, and "tried to get his hands down the front of [her] pants" and "the back of [her] pants." Teri testified that defendant held her for "[t]hree to five minutes" before she "wiggled away from him, and . . . kneed him and told him to leave me alone." When she was free, Teri "told him I'll make you a deal. If you leave me alone from now on, I won't tell your wife or the post office."

A couple weeks went by without incident. Then, on June 19, defendant returned to Teri's house. According to Teri, "[h]e walked through my front door again, and I looked up, and there he was. . . . He comes up to the left of me and stands on the edge, and he goes, what are you standing all the way over there for? I said, because I need to be. And then he leans over, and he kisses me right on the mouth, and I'm just like, that's it. I'm done. He's not going to take no for an answer." Teri told defendant to leave and went to the Apple Valley Post Office to file a complaint the same day.

Two days later, Teri went to the Apple Valley Police Department to report the incident. The police told her they would dispatch a deputy from the San Bernardino

6

County Sheriff's Department. That evening, a sheriff's deputy came to Teri's home and she gave a statement about defendant's conduct. Brianna was in the house at the time, and Teri believes Brianna could hear the interview. After taking Teri's statement, the deputy asked to interview Brianna. The deputy said he "believe[d] that [Teri and Brianna] were surprised when [he] took Brianna aside and interviewed her." Brianna seemed "shy and reluctant to talk to" the deputy, but she described the incidents that had occurred between her mother and defendant on June 7 and June 19 and said her mother "sounded scared." However, when she testified in court Brianna admitted she did not see or hear any of these incidents, except that she heard her mother tell defendant to "leave" in a loud, scared voice during the incident on June 7.

Brianna also accused defendant of touching her inappropriately when she was 13 years old. She told the deputy that "during a hug" defendant "had in the past grabbed her buttocks." She said defendant touched her like that "sometimes" and "she believed it was intentional" and that "it made her feel uncomfortable." Brianna gave live conditional testimony before defendant, the court, and the parties' attorneys, and the prosecution played excerpts from a video recording of that testimony for the jury.[3] Brianna testified that on one occasion defendant came into her house and "hugged me and he grabbed me."

---

[3] The court permitted Brianna to give conditional testimony outside the presence of the jury because she has a medical condition that puts her at risk of infection if exposed to large groups of people. The prosecution made a video recording of her testimony and the court allowed the prosecution to play excerpts for the jury in lieu of having her testify live. Defendant agreed to the procedure.

She said he used his hand to "touch[] my butt," described him as "grabb[ing] it" and agreed, when asked, that he "squeez[ed] it." She testified he had grabbed her "on purpose" and that it made her feel "[v]ery uncomfortable." She testified at the hearing that defendant had hugged her "quite a few times," but was very clear that he touched her buttocks and squeezed her only one time. She was unable to say when the inappropriate touching occurred.

Defendant gave a much different version of all these events. He admitted he and Brianna hugged each other. However, he testified that he never "touched Brianna inappropriately or against her will." He testified that there was never "a time that [he was] aware that Brianna was uncomfortable being around [him]" and there was never "a time that [he] had physical contact with her that [he was] able to perceive she was uncomfortable." Defendant denied that he ever "squeezed her buttocks" and said Brianna was not telling the truth when she said that he had.

Defendant admitted to touching Teri in a sexual manner, but contended the touching was consensual. According to defendant, Teri's back surgery, which for a time caused her to use a walker, sparked a limited sexual relationship. On a couple of occasions when defendant had delivered mail to her house, Teri showed him a scar from the surgery on her lower back and invited him to touch it. Revealing the scar required Teri to "lift[] . . . with one arm the shirt" about three or four inches above the waistline and "with the other arm pull[] down her pants or shorts" below "the top of the buttocks." Eventually, defendant began giving Teri back massages which became increasingly

8

sexual. According to defendant, she invited and responded to the contact. He said during some massages, Teri "would literally back into between my legs and rub her behind on my crotch area" using "[a] rhythmic kind of motion." He testified that he gave her intimate massages at least a couple dozen times between 2009 and 2012. He testified he never held her in a way that stopped her from breaking off the contact, she never recoiled or resisted, and "there was never a time that [he] initiated some sort of contact with her that she said she didn't want." Defendant testified that he felt remorseful about the relationship because both he and Teri were married.

Eventually, in May 2012, Teri sat down with defendant and "asked [him] if it's okay with [him] to stop doing the massages" and he said "sure." Defendant testified that he felt "[r]elieved" by her request because he "just didn't want to continue doing something that I knew in my heart was wrong." The next time defendant delivered mail at the house he had her sign for delivery of certified mail. Out of the blue, she said, "stop, Rocky; stop." He testified that he had not hugged, kissed, massaged, or otherwise touched or asked to touch Teri, and did not have any idea why she told him to stop. He asked her, "what do you mean? Stop what?" and she responded "stop means stop, or something in that sort. Leave." According to defendant, Teri "was speaking loudly enough that somebody . . . could have heard her" from "anywhere in the house." Defendant testified he "said okay" and left.

The prosecution also put on evidence that defendant had touched four other women in an inappropriate sexual manner. Susan N. is a clerk at the Apple Valley Post

9

Office who said she had a friendly relationship with defendant. She testified that in 2009, defendant used his hand to "grope [her] breast" during a hug in a hallway at work. After she walked away, she looked back at him and he "lifted up both hands, put them at about shoulder level" and "opened the fingers and closed the fingers, as if it's a kind of a squeezing motion." Susan N. testified that she "was in shock, and . . . humiliated" so she "just tried to pretend like nothing happened." A couple days later, she reported the incident to supervisors.

Sandra G. is a longtime resident of Apple Valley and postal customer of defendant. She testified that in 2009 he asked her for a hug. Initially, she ignored the request, but "then he asked me again, oh, aren't you going to give Rocky a hug?" When she complied, against her better judgment, "[h]e took his left hand and put it around me and pulled me in real tight, and then brought his other hand up and grabbed my breast and had a hold of my breast." She "tried to pull away, but he had me pulled really tight." Four weeks later, she complained to the post office. The post office disciplined defendant for this incident.

Amanda W. is Teri's oldest daughter. She testified that defendant delivered mail to her home for as long as she could remember. Amanda testified that defendant touched her inappropriately in 2011, when she was 19 years old. According to Amanda, defendant let himself in through the gate to the yard, grabbed her by the waist, pulled her close, held her for two to three minutes, and asked her several times to kiss him. After Amanda told defendant she would not kiss him, he kissed her on the forehead. Amanda

10

then took the mail he had delivered, walked into the house, and locked the door. She did not tell anyone about the incident until a month before trial in 2014. She said she did not complain earlier because she was scared of defendant.

Cindy C. was defendant's coworker at the post office. In 2010, Cindy C. accused defendant of touching her breast. A couple days later, defendant joked to other employees that "at least it happened to somebody who enjoyed it." Cindy C. did not testify at trial, but defendant admitted these facts.

Defendant's response to each of these incidents was the same; he denied them. He told the deputy who investigated Teri's complaint that he had been accused of groping Sandra G.'s breast, but said her complaint was unfounded. He also told the deputy that he had been "cleared of those allegations." Though law enforcement did not press charges against him, the post office disciplined defendant for his conduct. At trial, defendant testified that Sandra G. "wasn't telling the truth" in her testimony to the jury and said he never grabbed her breast. His testimony about Susan N.'s allegations was the same. Defendant denied her allegations and testified that Susan N. "wasn't telling the truth" when she told the jury he had grabbed her breast. Similarly, with respect to Amanda's allegations, defendant denied he had "hugged her inappropriately and wouldn't let her go" and denied Amanda ever "tried to avoid or tried to stop [him] from hugging her." He also denied he had ever "asked her to kiss and hug [him]." According to defendant, Amanda was "not telling the truth either." Finally, he admitted he touched Cindy C.'s breast, but contended it was an accident.

11

With regard to "evidence that the defendant committed other offenses" against Teri "that were not charged in this case" the trial court instructed the jury that it could "consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offense."  If the jury found the People had met that burden, the court explained, it was permitted to "consider that evidence for the limited purpose of deciding whether or not the defendant acted with the specific intent required to prove a crime charged in this case, the defendant's alleged actions were the result of a mistake or accident, the defendant had a plan or scheme to commit the offenses alleged in this case, or the defendant reasonably and in good faith believed that Teri W. consented."

With regard to "evidence that the defendant committed the crimes of sexual battery of Susan N., sexual battery of Sandra G., and sexual battery of Amanda W., that were not charged in this case," the court instructed that "[y]ou may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses . . . [and] you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses.  And based on that decision, also conclude that the defendant was likely to commit and did commit one or more of the crimes as charged here."  The court also instructed the jury that it could, in addition, consider this information for the limited purposes set out in the prior paragraph, including for concluding defendant acted with specific intent in committing a charged offense.

12

On June 24, 2014, the jury convicted defendant on the count of committing a lewd act on Brianna, but acquitted him on the child molestation count and the burglary count, as well as the sexual battery and aggravated sexual battery counts related to his treatment of Teri.

On September 19, 2014, the trial court held a hearing to determine whether to sentence defendant to probation or prison and, if prison, whether to sentence him to a term of three, six, or eight years allowed by section 288, subdivision (a). The court considered a victim impact statement by Teri, a probation report, a psychological assessment, and the evidence presented at trial.

A psychologist examined defendant as required before granting probation to any defendant "convicted of committing any lewd or lascivious act." (§ 288.1.) The psychologist concluded defendant "has readily apologized for the harm he had caused both to the victims as well as his wife and family. . . . His personality structure or history do not suggest that he has any pedophilic or sexually deviancy per se and he does not pose a danger to children or society at large. . . . He is genuinely repentant of his misdeed and is extremely unlikely to repeat the behavior." Based on these findings, the psychologist recommended "defendant be given probation during which he should seek continuing counseling from his pastor as determined by the pastor."

The probation officer concluded that the following factors supported probation: (i) the nature and circumstances of the crime were not serious compared with other instances of the crime, (ii) defendant's prior record does not indicate a pattern of regular

13

or increasingly serious criminal conduct, (iii) defendant was not subject to parole or probation at the time of the offense, (iv) defendant indicated a willingness to comply with the terms of probation, (v) defendant had the ability to comply with the terms of probation, (vi) imprisonment would seriously affect defendant and his dependents, (vii) a felony conviction would adversely affect defendant's life, (viii) defendant had shown remorse, and (ix) defendant would not pose a danger to others if released. However, the probation officer "recommended that probation be denied" based on the mistaken belief that "the court did not refer the defendant for a PC 288.1 report," a statutory prerequisite for probation.

The probation officer found that the "planning, sophistication or professionalism" of the crime aggravated the offense, and the fact that defendant "would have been granted probation" had he been eligible mitigated the offense. The probation officer recommended the middle term sentence because "the circumstances in aggravation and those in mitigation . . . are of approximately equal weight."

The court found defendant had touched an intimate part of someone's body, but agreed with the probation report that "the circumstances of this particular offense, compared to the circumstances of other cases of PC 288, which I have heard, . . . puts this at the lower end of the scale as far as . . . your actions and the seriousness of this offense[.]" However, the trial court disagreed with many of the other findings in the psychological assessment and the probation report. First, the court found that defendant *does* have a record of prior criminal conduct that indicates a pattern of increasing

14

seriousness.  Second, because defendant has a prior felony conviction, the court found the conviction will not adversely affect his life.  Third, the court found that defendant has *not* shown remorse for his conduct.  Fourth, the court found that defendant *would* be a danger to others if not imprisoned.  The court explained its findings as follows:  "I believe that it appears from my perspective that you do have a pattern of increasing seriousness to the conduct that you've engaged in."  There is "a felony conviction . . . in a prior case . . . [s]o I don't see that as a factor to consider. . . .  I don't see that you've shown any remorse whatsoever for your conduct. . . .  I disagree . . . there is little likelihood that if not imprisoned the defendant will be a danger to others. . . .  I think that you are a serial offender, based upon the information that I've heard during the course of this trial.  I think we've seen the tip of the iceberg with respect to what your conduct has been with a number of people that testified before this Court.  Your history of employment and discipline within the United States Postal Service gives me that clear indication, and you seem to be emboldened by the accusations and not dissuaded by them."

For those reasons, the court decided probation was inappropriate and sentenced defendant to the statutory middle term of six years in state prison.

## II

## DISCUSSION

A.  *Sufficiency of Evidence*

Defendant argues his conviction for lewd conduct with Brianna should be reversed because the prosecution presented insufficient evidence "to establish that appellant acted

15

with the specific intent of obtaining sexual arousal or gratification." He contends Brianna testified only about the "nature of appellant's alleged acts" and "the record was completely silent with respect to any evidence establishing that he did so for purposes of sexual gratification." We disagree.

On a challenge to the sufficiency of evidence supporting a conviction, we "'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] [I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215; accord, *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1182-1183.) This standard is high, requiring an appellate court to "accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise." (*People v. Combs* (2004) 34 Cal.4th 821, 849.)

Penal Code section 288, subdivision (a) proscribes "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or

sexual desires." (Pen. Code, § 288, subd. (a).) "Criminal intent will rarely be shown by direct evidence and must frequently be inferred from a defendant's conduct." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1380.) "'[T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent.'" (*People v. Martinez* (1995) 11 Cal.4th 434, 445, quoting *People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 7.) Among other factors, the manner of the touching is relevant to deciding whether defendant had the requisite specific intent. (*Ibid.*) In addition, because a violation of Penal Code section 288, subdivision (a) is a sexual offense,[4] under Evidence Code section 1108, subdivision (a), "evidence of . . . defendant's other sex offenses constitutes relevant circumstantial evidence that he committed the charged sex offenses."[5] (*People v. Falsetta* (1999) 21 Cal.4th 903, 920; see also *People v. Villatoro* (2012) 54 Cal.4th 1152, 1160 (*Villatoro*) ["[I]n a sex offense case, as here, the Legislature has made the careful determination that evidence the defendant committed one or more sex offenses may be properly considered pursuant to

---

[4] Conduct that violates Penal Code section 288 is defined as a sexual offense. (Evid. Code, § 1108, subd. (d)(1)(A).)

[5] Evidence Code section 1108 permits "evidence of the defendant's commission of another sexual offense or offenses" in any "criminal action in which the defendant is accused of a sexual offense," provided that "the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1108.) Evidence Code section 352 provides that a trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

17

[Evidence Code] section 1108"].) Other sex offenses may be charged or uncharged and must be proved by a preponderance of the evidence. (*Villatoro*, *supra*, at pp. 1164-1165.)

The jury heard sufficient evidence to conclude defendant touched Brianna with the specific intent to obtain sexual gratification. Brianna testified that defendant came into her house when she was 13 and "hugged me and he grabbed me," and used his hand to "touch[] my butt." She described his manner of touching her buttocks as "grabb[ing]" and "squeezing." She testified he had touched her "on purpose" and that it made her feel "[v]ery uncomfortable." She also testified that defendant had hugged her many times in the past, without touching her in a similarly intimate fashion. The jury evidently credited Brianna's testimony and rejected defendant's denials. Both the placement and the manner of defendant's touching support the conclusion that defendant touched Brianna with the specific intent to obtain sexual gratification. First, defendant touched Brianna on a part of her body that is considered intimate—both in the commonsense understanding of the term and as it is defined by the sexual battery statute.[6] Though section 288, subdivision (a) condemns the sexually motivated touching of *any* part of the body of a child under 14 years old (*Martinez*, *supra*, 11 Cal.4th at p. 451), the fact that defendant touched Brianna's buttocks, rather than her shoulder or arm, supports the inference that

---

[6] Section 243.4 defines "intimate part" of the body to mean "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female." (§ 243.4, subd. (g)(1).) The jury instructions informed the jury of this definition.

18

he acted with the specific intent to obtain sexual gratification.[7]  Second, defendant grabbed and squeezed Brianna's buttocks, an act that is most naturally interpreted as sexual.  Brianna evidently understood his conduct that way, because she testified she believed defendant acted on purpose and that the touching made her very uncomfortable at the time.  While it is true that defendant could have a nonsexual reason for touching Brianna's buttocks, the jury was free to adopt the reasonable inference that defendant had the requisite intent.

Brianna's testimony did not stand on its own.  The jury also heard circumstantial evidence that defendant acted with the requisite intent in the form of testimony that defendant had a propensity to commit similar sexual offenses.  Sandra G., a postal customer, testified that defendant asked her for a hug and then "took his left hand and put it around me and pulled me in real tight, and then brought his other hand up and grabbed my breast and had a hold of my breast."  Susan N., a coworker, testified that defendant used his hand to "grope [her] breast" during a hug in a hallway at work and then, afterward, taunted her with a crude gesture.  Amanda, a postal customer and Brianna's older sister, testified that defendant let himself in through the gate to her yard, grabbed

---

[7]      Defendant contends evidence about his "act of inappropriately touching Brianna's posterior" cannot be "evidence of lewd intent" because "the intent element is separate and independent from the physical act . . . ."  This argument is simply mistaken.  The same evidence may be relevant to proving two different elements of an offense.  In this case, the evidence that defendant touched Brianna's buttocks is direct evidence that he touched her body and circumstantial evidence that he did so with the specific intent of obtaining sexual gratification.

19

her by the waist, pulled her close, held her for two to three minutes, and asked her several times to kiss him. Defendant admitted that Cindy C., another coworker, accused him of touching her breast and that he later taunted her about it by joking to other coworkers that "at least it happened to somebody who enjoyed it." Finally, Teri, Brianna's mother, testified that defendant touched her inappropriately on multiple occasions. Teri described in detail two of those incidents that were not the basis of any charges in the case. She testified that while she was sitting in her car at the centralized mailboxes defendant once "reached in my car and grabbed" her breast and another time "stuck his head in my window and kissed me."

The testimony of at least four of these other victims was sufficient to allow a jury to conclude by a preponderance of the evidence that defendant committed sexual battery by "touch[ing] an intimate part of another person . . . against the will of the person touched . . . for the specific purpose of sexual arousal. . . ." (§ 243.4, subd. (e).) Sandra G., Susan N., and Teri testified that defendant groped their breasts without consent.[8] Defendant admitted Cindy C. accused him of touching her breast against her will. Section 243.4, subdivision (g)(1) provides that the breast of a female person is an intimate part within the meaning of the statute. In addition, the jury heard testimony that defendant was formally disciplined by the post office for his treatment of Sandra G.

---

[8] Amanda's allegations do not appear to support finding a sexual battery because she did not accuse defendant of touching an intimate part of her body as defined in the statute.

20

Though defendant denied the charges against him were true, the jury could reasonably have credited his accusers' testimony. Moreover, the conclusion that defendant sought sexual gratification from his groping was also supported by testimony that on two occasions defendant made crude gestures or comments related to his behavior. From all this evidence the jury could reasonably have concluded that defendant had committed a series of prior sexual offenses.

The jury could reasonably have concluded from these prior sexual offenses that defendant had a propensity to commit similar sexual offenses and that defendant had the specific intent to obtain sexual gratification by groping Brianna. The court properly instructed the jury that if it found prior instances of sexual battery, it was permitted to "consider that evidence for the limited purpose of deciding whether or not the defendant acted with the specific intent required to prove a crime charged in this case" and to "conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit one or more of the crimes, as charged here."

The court also properly instructed the jury that "[i]f you conclude that the defendant committed the uncharged offenses that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any crime." Taken together with Brianna's testimony regarding the nature and manner of defendant's unwanted touching, however, the jury could reasonably

21

conclude from these other sexual offenses that defendant had the specific intent to touch Brianna to obtain sexual gratification.

The jury may also reasonably have reached its verdict based on the conclusion that defendant was lying about his conduct with his other accusers. Leaving aside Brianna and Teri, three women took the difficult step of confronting defendant publicly in front of a jury to testify about a humiliating encounter with defendant. Susan N. testified that she "was in shock, and . . . humiliated" by defendant's conduct so she "just tried to pretend like nothing happened" and did not report it to supervisors for a couple of days. Sandra G. did not report defendant's conduct for four weeks, and even then she testified she "really wasn't going there to report it," but instead to ask whether "anybody ever came in here and made any kind of complaint against one of your postal workers." Amanda's response to defendant's conduct was to go directly into her house after defendant released her and lock the door. Defendant's response to each woman was dismissive. He testified that Sandra G. "wasn't telling the truth" in her testimony to the jury and said he never grabbed her breast. He testified that Susan N. "wasn't telling the truth" when she told the jury he had grabbed her breast. He testified that he never tried to kiss Amanda and she was "not telling the truth." The jury could reasonably have credited the testimony of the women who testified against defendant and concluded defendant was lying. That conclusion further supports the jury's decision to discount defendant's denial that he squeezed Brianna's buttocks for sexual gratification and his testimony that Brianna—like all his other accusers—"didn't tell the truth either."

22

The jury heard evidence that defendant touched Brianna on an intimate part of her body, that he did so in a manner most naturally interpreted as sexual, and that he has a propensity for touching women in this manner. This is substantial evidence that supports the jury's verdict.

Defendant contends the prosecution "did not and could not seek to admit" evidence of defendant's other offenses "for the purpose of establishing appellant's alleged intent *with respect to Brianna*" because the "evidence of appellant's alleged sexual desires with respect to adult women is plainly irrelevant to his intent with respect to his physical contact with Brianna." We disagree. The trial court permitted the Evidence Code section 1108 testimony without limitation and, as we have seen, instructed the jury that it could conclude on the basis of that evidence "that the defendant was likely to commit and did commit *one or more of the crimes as charged here*." (Italics added.) If, as defendant argues, the evidence of other offenses should have been excluded as it pertains to defendant's treatment of Brianna, either because it is irrelevant or unduly prejudicial, defendant should have objected on that basis at trial and objected to the trial court's instruction regarding the use of evidence of other offenses. (See *People v. Holloway* (2004) 33 Cal.4th 96, 133.)

Defendant contends that *In re Jerry M.* (1997) 59 Cal.App.4th 289 (*Jerry M.*) supports reversing his conviction. We disagree. The critical fact in *Jerry M.* was that the defendant was an 11-year-old boy, and the critical lacuna in the prosecution's case was that "there [was] no evidence he had reached puberty." (*Id.* at p. 300.) By contrast,

23

defendant in this case is a mature man.  Thus, the question whether he was capable of sexual arousal does not arise.  Even if it did, defendant's own testimony about his relationship with Brianna's mother establishes he is capable of sexual arousal.  Thus, the jury's inference that he touched Brianna with the specific intent of obtaining sexual gratification was not missing the same critical premise.  Moreover, the defendant in *Jerry M.* suggested his conduct was sexually innocent because he was engaged in teasing conduct meant to irritate.  Defendant in this case did not offer any innocent excuse for squeezing Brianna's buttocks; he simply denied it happened at all.  The jury could reasonably reject that denial.

   B.  *Sentencing*

   Defendant contends the trial court abused its discretion because it "relied on plainly improper factors in denying probation and sentencing appellant to the middle term of six (6) years, rather than the lower term of three (3) years. . . ."  Specifically, defendant contends the trial court erred by relying on defendant's commission of sexual offenses against victims other than Brianna and his lack of remorse.  We disagree.

   "California law affords the trial court broad discretion to consider relevant evidence at sentencing."  (*People v. Towne* (2008) 44 Cal. 4th 63, 85 (*Towne*).)  "[T]he court may consider the record in the case, the probation officer's report, . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, . . . and any further evidence introduced at the sentencing hearing."  (§ 1170, subd. (b); also *ibid*.)  The trial court may also consider any "criteria reasonably related to

24

the decision being made." (Cal. Rules of Court, rule 4.408(a); also *Towne*, *supra*, at p. 85.)

We review the trial court's exercise of discretion at sentencing for abuse. (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1091 ["The decision whether to grant or deny probation is reviewed under the abuse of discretion standard"]; *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582 ["The trial court did not abuse its discretion by imposing the midterm [sentence] on count four"]; see also § 1170, subd. (b) ["When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court"].) We are required to presume the trial court acted to achieve legitimate sentencing objectives. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977.) A "'decision will not be reversed merely because reasonable people might disagree. An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.]" (*Id.* at p. 978.) We may displace the trial court's decision only if there is a clear showing the sentence was arbitrary or irrational. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).) A trial court abuses its discretion if it relies upon circumstances that are not relevant to, or that otherwise constitute an improper basis for, the sentencing decision. (*Ibid.*)

The trial court had a reasonable basis for denying probation. It found that defendant touched an intimate part of Brianna's body but recognized that he did so in a way that "puts this at the lower end of the scale as far as . . . the seriousness of this

25

offense." That fact counsels in favor of probation. (Cal. Rules of Court, rules 4.414 & 4.414(a)(1).) However, the court decided to deny probation based on indications of defendant's recidivism. Defendant admitted he was convicted for a serious domestic assault against his former wife in 1986. Though that offense was remote in time, the court also looked to the Evidence Code section 1108 evidence of defendant's other sexual offenses and the conviction in this case to find defendant is a "serial offender" who would be "a danger to others if not imprisoned." The court's conclusion is well supported by the trial evidence. As the court noted, four women other than Brianna testified before the court that defendant had committed sexual batteries against them, and defendant's employer, the United States Postal Service, reprimanded defendant for one of those incidents. This evidence gave the court a reasonable basis for denying probation. Since the trial court was permitted to consider "[t]he likelihood that if not imprisoned the defendant will be a danger to others" (Cal. Rules of Court, rule 4.414(b)(8)) as well as any "criteria reasonably related to the decision being made" (Cal. Rules of Court, rule 4.408(a)), we cannot say the court's decision was arbitrary, irrational, or based on an improper consideration. (See *Towne*, *supra*, 44 Cal.4th at pp. 85-86.)

The trial court also acted reasonably in imposing a middle term six-year sentence. The selection of the term from the statutorily specified triad, like the decision to grant or deny probation, is discretionary. (*Sandoval*, *supra*, 41 Cal.4th at p. 847.) Reversal is proper only if defendant makes a clear showing the sentence is arbitrary or irrational. (*Ibid.*) The court was permitted to consider any relevant factors in choosing among those

sentences. We hold that the court's concerns about recidivism discussed *ante* provided the trial court with an adequate basis for selecting the middle term sentence. Though the court was not required to find aggravating factors to impose the middle term sentence, we note in addition that the probation report supported finding the "manner in which the crime was carried out indicates planning, sophistication, or professionalism." (See Cal. Rules of Court, rule 4.421 (a)(8).) Accordingly, we hold that the sentence was properly "based upon an 'individualized consideration of the offense, the offender, and the public interest.'" (*Sandoval*, *supra*, at p. 847.) The trial court did not abuse its discretion.

Defendant contends the court erred by looking to Evidence Code section 1108 to support its denial of probation and its sentence. We disagree. The general principles set out by Penal Code section 1170 and the California Rules of Court regarding sentencing make clear that the trial courts may consider any relevant evidence for purposes of determining the appropriate sentence. First, Penal Code section 1170, subdivision (b) provides "the choice of the appropriate term shall rest within the sound discretion of the court," and specifies that "[i]n determining the appropriate term, the court may consider *the record in the case*, the probation officer's report, other reports, . . . and statements in aggravation or mitigation . . . and any further evidence introduced at the sentencing hearing." (Pen. Code, § 1170, subd. (b), italics added.) The court admitted testimony of Sandra G., Susan N., and Amanda as relevant evidence regarding defendant's proclivity to commit sexual batteries. Teri also provided such testimony concerning two uncharged offenses. All of this testimony is therefore relevant and part of the record of this case.

27

(*Villatoro*, *supra*, 54 Cal.4th at p. 1160.) There can be no question this proclivity evidence is also relevant to the likelihood that defendant would harm others if not imprisoned. California Rules of Court, rule 4.408 specifies that the trial court may consider any "criteria reasonably related to the decision being made." (See also *Towne*, *supra*, at p. 85.) Since "[p]reventing the defendant from committing new crimes by isolating him or her for the period of incarceration" is one of the general objectives of sentencing (Cal. Rules of Court, rule 4.410(a)(5)), evidence of defendant's multiple prior sexual batteries is reasonably related to the sentencing decision. We therefore conclude that the court properly considered the testimony of defendant's prior victims in denying probation and deciding on an appropriate sentence.

Defendant contends the trial court erred in considering the evidence of his uncharged sexual batteries because they were insufficiently related to the offense against Brianna. He presents *People v. Coulter* (1983) 145 Cal.App.3d 489 and *People v. Searle* (1989) 213 Cal.App.3d 1091 as holding that a "trial court may not use the facts relating to one count to aggravate the sentence as to a different count" unless the crimes are "transactionally related." According to defendant, if he "cannot be sentenced based on transactionally unrelated counts for which he has been *convicted*, surely he cannot be sentenced based on equally unrelated counts for which he has been *acquitted*, or for which he was *never charged*."

Defendant's reliance on these authorities is misplaced. In *Coulter*, the trial court found the base offense involved multiple victims, though defendant committed two

28

unrelated offenses and each harmed a single victim. (*People v. Coulter*, *supra*, 145 Cal.App3d at pp. 491-492.) In *Searle*, the trial court found the base offense involved the participation of minors, though the minors were involved in two unrelated crimes. In both cases, the Court of Appeal held that the trial court erred by using facts about the unrelated offenses as if they were circumstances relating to the base offense that justified imposing an upper term sentence under California Rules of Court, rule 4.421(a). Here, the trial court did not consider the evidence related to defendant's other sexual offenses to reach any conclusion about defendant's *offense* at all. It used evidence of those offenses to reach a conclusion about *defendant*, specifically, that he is a recidivist who poses a threat to other potential victims. Nor did the court rely on the evidence to find an aggravating factor justifying an upper term sentence. Defendant has not identified any authority suggesting it is an abuse of discretion for a court to consider evidence of defendant's recidivism to impose a middle term sentence, and we hold the court's consideration of that evidence was permissible for that purpose.

Defendant contends his sentence should be reversed on the ground that the trial court improperly based its sentencing decision on evidence related to the sexual battery and aggravated sexual battery counts involving Teri. He objects on the ground that the jury acquitted him of those offenses. We have reviewed the record and do not understand the trial court to have relied on evidence related to the acquittals. The court did not mention that evidence in setting out its reasons for denying probation and imposing the middle term sentence. We understand the prosecutor's statements that the other sexual

29

offenses "[don]'t have to be a conviction" and the court's statement that it relied on "information that I've heard during the course of the trial" to refer to the evidence of other uncharged sexual offenses, which we have held the court was permitted to consider in deciding on the appropriate sentence. Defendant admits "the record is unclear as to whether it did in fact consider" evidence related to the acquittals. We conclude defendant has not sustained his burden of showing the court abused its discretion.

Defendant also contends his sentence should be reversed because the trial court improperly based its sentencing decision on his lack of remorse. The probation report found that defendant showed remorse for his conduct as a basis favoring probation. Defendant relies on *People v. Key* (1984) 153 Cal.App.3d 888, which held that lack of remorse is not a valid reason to aggravate a sentence where the defendant denies the charges and the evidence of guilt is not overwhelming. (*Id.* at p. 901.) We do not find *Key* relevant to this case. Here, the trial court disagreed with the probation report finding that defendant showed remorse only as a reason to deny probation. The court did not find lack of remorse to be a reason to aggravate defendant's sentence. Indeed, the trial court found no aggravating factors and imposed the middle term sentence. In any event, even if the court did consider defendant's lack of remorse as a reason for choosing the middle term sentence, other reasons for imposing that sentence discussed *ante* provided adequate, independent support for the sentence. Any error was therefore harmless.

## III

## DISPOSITION

We affirm the judgment.

CERTIFIED FOR PARTIAL PUBLICATION


RAMIREZ
_____
P. J.

We concur:


HOLLENHORST _____
J.


CODRINGTON _____
J.

31