Filed 6/21/22 P. v. Harper CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077940 |
| v. | (Super.Ct.No. FMB21000148) |
| MICHAEL ALAN HARPER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Rodney A. Cortez, Judge. Affirmed.

Michael Alan Harper, in pro. per., and David Zarmi, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury found defendant and appellant, Michael Alan Harper, guilty of second degree robbery. (Pen. Code, § 211.)[1] The court sentenced defendant to the midterm of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

three years of imprisonment. After defense counsel filed a notice of appeal, this court appointed counsel to represent defendant.

Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the facts, a statement of the case, and identifying one potentially arguable issue: whether the court erred in not instructing the jury sua sponte with CALCRIM No. 1600 on the issue of force.

Defendant was offered the opportunity to file a personal supplemental brief, which he has done. Defendant contends (1) his trial counsel rendered ineffective assistance of counsel, (2) he had a conflict of interest with his trial counsel, (3) he should have been sentenced to the "low term" instead of the midterm, and (4) he should qualify for "half-time" credit. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 9, 2021, defendant and the victim, defendant's girlfriend with whom he lived part-time, went out to a bar to watch a band play. By the time they left, defendant was "pretty drunk." Defendant opened the door while the victim was driving home and "decided to try to jump out." Defendant intentionally spilled a soda all over the console of the victim's car. According to the victim's testimony, she hit defendant three times; defendant attempted to defend himself. The victim called the police.

When defendant and the victim arrived at her home, the victim went inside. Defendant smashed a terrarium on the porch because the victim would not let him inside

2

the house. Defendant also punched one of the windows of the home, breaking it. The victim called 911. Defendant left.

An officer responded to the victim's home. The officer observed that one of the home's windows was broken. There was a broken fish tank on the porch. The victim was upset and crying. The officer recorded her conversation with the victim. The victim said defendant had hit her twice on the right side of the face.

After the officer left, defendant returned. The victim called the police a third time. The victim let defendant inside the home to retrieve his belongings. Defendant, "being drunk and ridiculous decided to procure [the victim's] phone from [her] hand." The victim testified defendant obtained her phone nonaggressively: "He physically took it and he, like, walked away like he had taken a pot of gold."[2] Defendant left with her phone.

Thereafter, another officer arrived. The victim told the officer defendant had stolen her phone. She said she had the phone in both hands; defendant "snatched it out of my hands." The victim told the officer she was in fear that defendant was going to hurt or kill her when he took her phone.

The People charged defendant by information with second degree robbery (§ 211, count 1) and domestic battery (§ 243, subd. (e)(1), count 2). After the preliminary

---

[2] The People played video and audio footage from the victim's surveillance system, which showed defendant taking the phone.

3

hearing, the court held a *Marsden*[3] hearing during which defendant contended there had been a breakdown in the attorney-client relationship. The court noted, "It wouldn't be a day with you . . . if you didn't ask for a *Marsden* motion." Defendant specifically alleged defense counsel would not accept his collect calls, had not filed a motion for bail reduction at an earlier date, and wanted counsel removed because "he never has any type of contact with me."

Defense counsel responded that he had filed a motion to reduce defendant's bail or for the release of defendant on his own recognizance, which was scheduled for a hearing that day. Defense counsel informed the court he had been "a bit under the weather for a couple weeks. . . . I was not making any jail visits." The court denied the *Marsden* motion. The court also denied the motion for release or bail reduction.

Prior to trial, the People stated, "I would like to put on the record that the offer that was made for the defendant on this case was . . . felony probation on a non-strike, terminate probation on the misdemeanor as unsuccessful."[4] The People further stated, "And it would be credit for time served and he would be released today." Defendant rejected the offer on the record.

Defendant then asked about drug court. The People offered defendant the same plea with a disposition of drug court. Defendant rejected that offer as well.

---

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[4] Defendant was on summary probation in four separate misdemeanor cases when he committed the instant offense.

4

Defense counsel noted, "Can I just clarify the record in case it is appealed down the road? All of these offers have been communicated to [defendant] previously." The court asked, "Including the drug court?" Defense counsel responded, "Including drug court. Again this morning I communicated a 245(a)(4) offer with the probationary terms earlier this week when I visited [defendant] in jail."

In addressing the People's in limine motion, the court ruled that it would allow the People to admit evidence of two of defendant's prior convictions for domestic abuse for impeachment purposes should defendant testify. Midtrial, the court asked defense counsel if he had discussed whether defendant would testify. Defense counsel stated, "I've had a conversation." The court told defense counsel to "have that discussion with him."

After the People rested their case, the court noted, "The next issue is whether or not [defendant] is going to testify." Defense counsel responded, "At the advice of counsel, [defendant] will not be taking the stand." The court asked defendant if that was correct, and defendant responded, "I guess." The court replied, "Well, you have the right to testify on your own behalf. You also have the right to remain silent. What have you decided . . . is your choice?" Defendant stated, "I guess I'm not going to testify."

After testimony in the case was completed, defendant requested another *Marsden* hearing. The court noted, "[Y]ou've been through this process numerous times. You've been in my courtroom multiple times on different cases throughout the years since I've been on the bench here starting in 2007. And it's not uncommon, [defendant], for you to make repeated requests for *Marsden* motions as to all lawyers who have represented you

5

over the years. I'm making that record just so the appellate court is aware that this is not a one-off but it's a repeated request that you make regardless of who is representing you."

Defendant said that he had previously known defense counsel under a different name. Defendant said that the previous year, at a different hearing, "I requested to have him removed because he was trying to get me to take a plea bargain. He was yelling at me, calling me names and stuff like this. You never granted the *Marsden*[] hearing."

Defendant further explained, "This year, this case, I've requested the same thing. There's been a breakdown in communication, as I've always stated. He goes on his own tirades. He does not listen to me. He gets upset. He uses a lot of profanity, and I don't know. I think there's built-up animosity from earlier years."

Defendant said, "I knew him from high school. And I went to high school with his younger brother. . . . [M]ost of our talks have been about Yucaipa, and not even my case. [¶] . . . [¶] No. I feel that from—from the younger years, from high school and everything, that there's a lot of animosity and I never even realized that he [went by another name]. Because the name change kind of threw me off."

Defense counsel responded, "I previously represented [defendant] last year, I believe, at the very beginning of the pandemic on a domestic violence case. I think there was something else, probably a violation of probation that followed." Defense counsel noted defendant was "a bit confused on his chronology. I'm actually younger than [defendant]. In fact, the high school was a 3-year high school. I didn't start attending Yucaipa High until the Fall of 2000. I have an older brother though who was about

6

[defendant's] age, give or take a year, who would have gone to school with [defendant]." Counsel noted that his last name changed when he turned 18.

"It's a 3-year high school. My brother and [defendant] would have been graduated before I even started at Yucaipa High." Defendant "brought this up. He's, like, oh, you grew up in Yucaipa? I was, like, yeah. Oh, I used to go to high school there. Oh, what year did you graduate? And this led to, oh, you might know my brother . . . . And that's—I finally thought I had broken ground with [defendant], thinking, oh, we can bond. . . . But I thought I'd finally broken new ground, and that was probably the Saturday before the trial started."

Defendant replied, "And I have met his mother and his father. His father was living in Arizona, I believe." The court noted, "Well, his father and his mother have nothing to do with your request for a *Marsden* motion." Defendant asserted, "Well, I feel a lot of this stems back to my high school years because I graduated in '99. And I was going to Yucaipa High School. And I also went to Yucca Valley High School and Palm Desert High School. I moved around a lot. [¶] . . . [¶] I did know his brother . . . ."

Defendant then added, "I wanted to take the stand. I was not allowed to take the stand." Defense counsel noted that he had discussed with defendant "whether he wished to take the stand or not. . . . I did advise him that it is probably not a good idea. He's on multiple counts of—he was in on multiple violations of probation. Some of them for domestic violence and a lot of these were fresh so he could easily be impeached by the district attorney, any testimony he would try to provide." The court asked whether counsel had advised defendant against testifying, and counsel said that he had. The court

7

asked whether defendant's "statement that you refused to let him testify is inaccurate," and defense counsel said defendant's statement was "inaccurate."

With respect to defendant's allegation that defense counsel had yelled at and used profanity toward defendant, defense counsel said, "I probably snapped at him a couple times this time. I probably didn't call him names nearly as much as I did the first time I represented him. [¶] . . . [¶] This morning, for instance, your Honor, I'm trying to go over, as you ordered me to, to go over the sentencing memo with him. And the entire time he's telling me shut the fuck up. You're a cock sucker. So I'm, like, [defendant] shut up or probably shut the fuck up. I don't know and I apologize for swearing."

The court then suggested that this "leads us into another thing [defendant] brought up is he feels like somehow there's animosity you have toward him." Defense counsel replied, "I refresh myself every day when I know I have to deal with [defendant]. He frets. Calm as I can be. But when I'm trying to go over a sentencing memo and he's clearly telling me to shut the fuck up, you're a cock sucker, he gets under my skin a little bit. I don't think I'm being irrationally insensitive when I ask him can you please be a grown-up for 20 minutes while we get through this sentencing. [¶] . . . [¶] . . . Yes, sometimes I do take, like, swear at a client, maybe call him a name, and it's probably 20 to 1, as far as the insults go." "I absolutely understand that's unprofessional. I don't like being that way."

The court found, "as far as the statements [defendant] made with regards to your request for a *Marsden* motion and relieving [defense counsel] as your lawyer, I simply believe the statements made by [defense counsel]. He admitted that, yeah, there were

8

times he's yelled at you. There are times he's called you names. But he indicated that pales in comparison to the number of times that he's been met with that type of behavior from you. He admits at times that it was unprofessional. [¶] . . . [¶] But he's a human being just like everyone else. He indicates he told you your options and explained to you the plea bargain agreement options. You chose not to take it. That's your decision. And I believe that because you said that he refused to let you testify."

The court further observed, "I specifically asked you whether or not you were going to testify. You chose not to testify. I do that of every defendant in every case, is I do it outside the presence of the Jury. You made that choice. It's on the record."

The court found that defense counsel's representation of defendant was not tainted with animosity, and there was no breakdown in the attorney-client relationship. The court denied the motion.

The court instructed the jury with CALCRIM No. 1600 pursuant to the agreement of both parties. The jury found defendant guilty on the second degree robbery offense, but not guilty on the domestic battery offense.

The court referred defendant to probation, but defendant declined to be interviewed. Defendant was on summary probation in four cases when he committed the instant offense. The probation officer noted, "defendant's criminal history consists of mainly misdemeanor offenses; however, it is very extensive and increasing in seriousness. The defendant has criminal history in California and Nevada that spans over twenty (20) years. The defendant has prior charges that include battery, domestic violence, false imprisonment, obstructing/resisting a peace officer, trespassing, carrying a

9

concealed weapon in a vehicle, under the influence of drugs, and driving under the influence of alcohol." The probation officer recommended defendant be sentenced to the midterm of three years of imprisonment.

At the hearing on September 21, 2021, defense counsel requested that defendant be placed on probation or be sentenced to the low term of two years. The People countered, "He was on four grants of probation when this case occurred. Two of the four that he's on probation for originated as felony cases, [which] result[ed] as misdemeanors [due to] the victim's input in those cases which I think was really quite a gift to [defendant]."

The People argued, "the crime involved the threat of great bodily harm. That the defendant's prior convictions as an adult are numerous. In fact, the report summarizes his 20-year criminal history that the defendant was on a grant of probation when this crime occurred and that the defendant's prior performance on probation has been unsatisfactory." The People went over defendant's entire criminal history and argued that the court should sentence defendant to the aggravated term of three years of imprisonment.

Defendant asserted that he had never refused to meet with probation. The court referred the matter back to probation to interview defendant. During his interview with probation, defendant denied committing the instant offense. The probation officer observed, "Based on the defendant's criminal history and his overall behavior while on summary probation, the defendant is not amenable to formal supervised probation. . . . [D]efendant has been given multiple chances while on summary probation; but he has

10

chosen to continue his criminal behavior and victimize people in the community." The probation officer, again, recommended defendant be sentenced to the midterm of three years of imprisonment.

At the sentencing hearing, the court initially indicated a willingness to grant defendant formal, felony probation. However, when asked if defendant would quit drinking, defendant responded that he would "[t]ry to." When the court asked if defendant would comply with the probation conditions, defendant responded that he would, but he did not understand why there had to be a "no contact" order with the victim. The court noted that defendant was "making the DA's job a lot easier by [his] responses."

Defense counsel noted that defendant lived with his father who possessed firearms, which would place him in a position of violating his probation. Defense counsel also noted that defendant could not live with the victim because of the no contact order. A third place where defendant could potentially live posed transportation problems for defendant to report to probation.

The court noted that it was no longer inclined to place defendant on probation: "I've thrown him a rope, and he didn't like the rope I threw him. I put a ladder down the hole, he didn't like the ladder I put down the hole. I'm not going to entertain any more concerns that he has when I've given him a life line. [¶] Like I said multiple times, [defendant], you're your own worst enemy, and it is unfortunate because you were just granted a wonderful opportunity . . . ."

The court continued: "But all you can see are the problems and the disruptions it is going to cause in your life, and I'm going to afford that opportunity for people that understand the importance and the opportunity that is being given. [¶] Because some people just aren't amenable to [a] grant of probation. I was on the fence on you, [defendant], given the history that you have with this court and with your summary probation and was optimistic that by giving you this opportunity, that you would jump on the chance, and all I hear are the constant problems that you brought to the court. That it's everybody else's concerns, everybody else's problems, in the predicament you find yourself." The court declined to grant defendant probation.

The court found that "defendant's prior convictions as an adult are numerous and have increased in seriousness." The court also found that defendant was on a grant of summary probation when he committed the instant offense, and his performance on probation had been unsatisfactory. The court sentenced defendant to the midterm of three years of incarceration.[5]

## II. DISCUSSION

Defendant contends (1) his trial counsel rendered ineffective assistance of counsel, (2) he had a conflict of interest with his trial counsel, (3) he should have been given the low term at sentencing, and (4) that he should qualify for "half-time" credits. We disagree.

---

[5] The court also found defendant in violation of his probation in all four misdemeanor cases based on his conviction of the instant offense. The court revoked defendant's probation in each case and sentenced him to time served.

A. *Ineffective Assistance of Counsel*

Defendant contends defense counsel rendered ineffective assistance of counsel by (1) prohibiting him from testifying, (2) failing to convey the prosecutor's offers to him, (3) yelling and cursing at him, (4) allowing the prosecutor to have a PowerPoint slide reading, "Michael Harper is Guilty," during closing argument, and (5) not knowing about his multiple injuries. Defendant has failed to establish that defense counsel was prejudicially ineffective.

"'"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"'" (*People v. Rices* (2017) 4 Cal.5th 49, 80.)

The record reflects that defense counsel discussed the dangers of testifying with defendant on multiple occasions and advised against it. However, counsel never refused to let him testify. Indeed, the court asked defendant in open court whether he wanted to testify, and defendant responded that he did not. The court found that defendant had voluntarily declined to testify. (*People v. Nelson* (2011) 51 Cal.4th 198, 210 ["'We do not reweigh evidence or reevaluate a witness's credibility.'"]) Thus, nothing prevented defendant from testifying.

13

The record additionally reflects that defense counsel memorialized, on the record, that he had conveyed the People's offers to defendant, and the court found that defense counsel had conveyed the offers to defendant. (*People v. Nelson*, *supra*, 51 Cal.4th at p. 210 ["'We do not reweigh evidence or reevaluate a witness's credibility.'"].) Defendant rejected the offers in open court. Thus, the record reflects that defense counsel conveyed the People's offers to defendant.

The court also found that although defense counsel had been intemperate with defendant, he had only done so in reaction to extreme provocation from defendant. Even so, the court found defense counsel had performed his duty as counsel for defendant.

Moreover, there is no evidence on this record that the People presented a PowerPoint slide reading, "Michael Harper is Guilty," during closing arguments. (*People v. $17,522.08 United States Currency* (2006) 142 Cal.App.4th 1076, 1084 ["Appellant bears the burden to provide a record on appeal which affirmatively shows that there was an error below and any uncertainty in the record must be resolved against appellant."].)

Finally, defendant does not explain why defense counsel's purported ignorance of defendant's injuries would have any effect upon his representation of defendant. Thus, defendant has forfeited any argument on that basis. An appellate court need not consider mere contentions of error unaccompanied by legal argument. (*People v. Earp* (1999) 20 Cal.4th 826, 884; see *People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' [Citations.] This principle is especially true when an

appellant makes a general assertion, unsupported by specific argument . . . ."].) Thus, defendant has failed to show that defense counsel's representation fell below an objective standard of reasonableness or that any purported error resulted in prejudice.

### B.     *Conflict of Interest*

Defendant contends he had a conflict of interest with defense counsel because he attended high school with defense counsel's brother; he "used to get high, drink, [and] pick on [defense counsel's] brother, at his mother's house in Yucaipa." He also asserts that he knows defense counsel's parents.

"The right of a criminal defendant to the effective assistance of counsel is a substantial right guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 15 of the California Constitution. This constitutionally guaranteed right includes the correlative right to counsel who is free from any conflict of interest that undermines counsel's loyalty to his client's cause. [Citation.] 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. [Citation.]"' [Citation.] If a conflict of interest impedes defense counsel from asserting his client's contentions without fear of consequences to himself or herself, the integrity of the adversary system is cast into doubt because counsel cannot 'play[] the role necessary to ensure that the trial is fair.'" (*Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1137-1138.)

Here, even if defendant knew defense counsel's brother and parents, defendant failed to show how that would prejudice defense counsel against him. Only on appeal

15

does defendant allege any basis for a conflict, that defendant picked on defense counsel's brother. However, by failing to allege that basis below, defendant has forfeited the contention on appeal. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["As we have observed on numerous occasions, ""'a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'"""].)

Moreover, it is difficult to see how the bare allegation that defendant had picked on defense counsel's brother, in high school, some 20 plus years earlier, especially without a response from defense counsel, would have biased defense counsel against defendant, whom defense counsel had previously represented. Defendant has failed to allege a conflict of interest that violated his constitutional rights. (*People v. Doolin* (2009) 45 Cal.4th 390, 417 [A defendant can only prevail on a conflict-of-interest claim "if he can demonstrate a violation of his constitutional rights."].)

C. *Sentencing.*

Defendant contends the court abused its discretion in imposing the midterm of three years of imprisonment. We disagree.

"The selection of the term from the statutorily specified triad . . . is discretionary. [Citation.] Reversal is proper only if defendant makes a clear showing the sentence is arbitrary or irrational. [Citation.] The court [is] permitted to consider any relevant factors in choosing among those sentences." (*People v. Shenouda* (2015) 240 Cal.App.4th 358, 369 [The court acted within in its discretion in imposing the midterm based on its

16

concerns about defendant's recidivism.].) "[T]he court [is] not required to find aggravating factors to impose the middle term sentence . . . ." (*Id.* at p. 370.)

Here, in imposing the midterm sentence, as recommended by the probation officer, the court noted that "defendant's prior convictions as an adult are numerous and have increased in seriousness." The court found defendant was on a grant of summary probation when he committed the instant offense and that his performance on probation had been unsatisfactory.

The record supports the factors listed by the court. The probation officer's report reflects that defendant had 20 prior convictions for over two dozen misdemeanor offenses, including numerous assaults, batteries, and domestic violence offenses. Defendant had violated prior grants of probation on numerous occasions. His commission of the instant offense violated his probation in four separate misdemeanor cases. The court acted within its discretion in imposing the midterm sentence.

### D.    *Credits.*

Defendant contends that he should qualify for "half-time" credits. We disagree. "Notwithstanding any other law, any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933.]" (§ 2933.1, subd. (a).) "[R]obbery is a "'serious felony'" under section 1192.7, subdivision (c)(19) and a "'violent felony'" under section 667.5, subdivision (c)(9) . . . ." (*People v. Hernandez* (2017) 10 Cal.App.5th 192, 199, fn. 4; see *People v. Lynn* (2015) 242 Cal.App.4th 594, 598-599 [Second degree robbery qualifies as

a serious and violent felony.]; *In re Mohammad* (2022) 12 Cal.5th 518, 541 [Second degree robbery is a violent felony.].)

Here, the jury convicted defendant of second degree robbery. (§ 211.) Second degree robbery qualifies as a violent felony under section 667.5, subdivision (c). Thus, defendant is limited to accruing "15 percent of worktime credit." (§ 2933.1, subd. (a).)

## III. DISPOSITION

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no arguable issues. The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MILLER
J.

FIELDS
J.

18