Filed 6/8/16 P. v. Khong CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076416 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F05779) |
| v. | |
| TONY KHONG, | |
| Defendant and Appellant. | |

A jury found defendant guilty of two counts of pimping a minor under 16 years of age (Pen. Code, § 266h, subd. (b)(2) (counts one & two)[1]), one count of pandering a minor under 16 years of age (§ 266i, subd. (b)(2) (count four)), and two counts of human trafficking a minor (§ 236.1, subd. (c)(1) (counts seven & eight)). The trial court sentenced defendant to an aggregate determinate term of 20 years.

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

On appeal, defendant contends that the prosecutor committed misconduct in her closing argument by: (1) using a puzzle analogy that reduced the burden of proof; (2) referring to matter outside of the record to establish the veracity of the prosecution's primary witness; and (3) appealing to the passions of the jurors. Defendant asserts that these instances of prosecutorial misconduct, individually and cumulatively, resulted in prejudice, and, consequently, the judgment must be reversed. Defendant also asserts that, insofar as his contentions have been forfeited, he was deprived of his constitutional right to the effective assistance of counsel. Finally, defendant contends that the trial court abused its discretion in sentencing him to the upper term on count seven.

We conclude that the instances of alleged prosecutorial misconduct raised by defendant either did not constitute misconduct or did not result in prejudice. Furthermore, defendant was not denied the effective assistance of counsel. We also conclude that the trial court did not abuse its discretion in sentencing defendant to the upper term on count seven.

We modify the judgment to correct the trial court's section 654 sentencing error. Given that the trial court chose to exercise its discretion to impose the upper term on the base term count, it is clear the trial court would impose the maximum sentences on the counts that are subject to section 654 if we were to remand. Accordingly, we: (1) impose upper term sentences of eight years on counts one and two, pimping a minor under 16 years of age (§ 266h, subd. (b)(2)), and stay execution of those sentences pursuant to section 654; and (2) impose an upper term of eight years on count four, pandering a minor under 16 years of age (§ 266i, subd. (b)(2)), and stay execution of that sentence pursuant to section 654.

As so modified, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges and Enhancement Allegation

Defendant was charged with two counts of pimping a minor under 16 years of age (§ 266h, subd. (b)(2) (counts one & two)), two counts of pandering a minor under 16 years of age (§ 266i, subd. (b)(2) (counts three & four)), unlawful sexual intercourse with a minor under 16 years of age (§ 261.5, subd. (d) (count five)), and two counts of human trafficking a minor (§ 236.1, subd. (c)(1) (counts seven & eight)).[2]

It was further alleged that defendant had a prior serious felony conviction within the meaning of section 1192.7, subdivision (c), rendering him eligible for second strike sentencing (§§ 667, subds. (b)-(i), 1170.12).

### The People's Case-in-Chief

S.T., a minor, was 17 years old at the time of trial. In 2011, when S.T. was 15 years old, she met a girl named C.T., also a minor. On a day approximately three weeks after S.T. met C.T., she received a text from C.T. asking her to pick her up from a gas station in Elk Grove. At the time, S.T. was with her friends Tyrone Tran, whom she had known for five years, and defendant, whom she had just met that day through Tyrone. Defendant, Tyrone, and S.T. went to pick up C.T. in defendant's car. Defendant then dropped S.T. off at her home.

Approximately one week later, S.T. decided to run away. She was experiencing difficulties at home; she testified that her mother "was not really mom material." When she decided to run away, S.T. called Tyrone and asked him to pick her up. Tyrone took S.T. to his house. A day or so later, S.T. again met up with C.T., and they began to spend time together.

---

[2] Count six charged Stephen Tran with unlawful sexual intercourse with C.T. He is not a party to this appeal.

Having run away from home, S.T. moved around to "[l]ots of places." She did not have a job or any way to earn a paycheck, and C.T. bought food for her. S.T. did not know how C.T. made money, but she did sometimes see C.T. leave with defendant to go somewhere. Defendant would be talking on the phone and he would leave the room. When he returned, he would tell C.T. that she had work. C.T. would leave with defendant, and she would return approximately an hour later. S.T. did not know where C.T. would go, but when she returned, C.T. would have money and food.

At some point during the time between October and December 2011, defendant had a conversation with S.T. about how she could earn money. Defendant told S.T. that she "could either do this or [she] can just work at the strip bar." When defendant stated she could "do this," S.T. assumed that he was referring to prostitution. She had never engaged in prostitution before. S.T. knew it was wrong, she did not want to do it, and she knew that it would be a bad decision, but she felt pressured. S.T. initially refused.

C.T. continued to pay for S.T.'s food. Approximately two weeks after defendant's conversation with S.T., C.T. talked to S.T. and asked S.T. to help her. C.T. told S.T. that they both had to "do this in order to have a living." S.T. felt bad that C.T. continued to provide food for her. She felt that she could no longer let C.T. do everything for her, and that she needed to contribute. After considering the matter for some time, S.T. "decided to do it." Thereafter, she engaged in approximately 30 acts of prostitution.

S.T. did not find her own customers. Defendant made the arrangements. Defendant would receive a call, leave the room, return, and tell S.T. and C.T. that they had work. Defendant was the only person who told her when she had work. Defendant, Tyrone, or Stephen Tran would drive them to their destination, usually a motel. Sometimes Stephen would drive her to customers' homes. Tyrone had introduced S.T. to Stephen Tran at some point after S.T. had run away. If Tyrone or Stephen drove, defendant would tell them what to do. She never saw Tyrone or Stephen make the arrangements.

4

At the motel, a man would be waiting out front. They would follow the man to a motel room. Once in the room, they would not discuss with the man how much certain acts would cost. Instead, they would "just automatically do it," meaning either vaginal or anal intercourse. Sometimes S.T. and C.T. would go together, and other times they would go individually. When they went together, one of them would have intercourse with a customer while the other waited outside. S.T. would use condoms provided by defendant, Tyrone, or Stephen. After engaging in intercourse with S.T., the man would give money either to S.T. or to defendant. Defendant would be waiting outside when they were done. S.T. would receive $40 for each occurrence. She would give defendant $20. The amount of money she gave defendant was "[d]ue to the sex act." When asked why she gave defendant $20, S.T. said, "It was for respect. For me, he let me sleep over. He gave me a roof over my head. He gave me food. [¶] I mean, he gave me a living, like, although it was hard for me." S.T. would keep the other $20. S.T. testified that she also bought food for defendant, also for "[r]espect." S.T. never gave Tyrone or Stephen money when they drove her. S.T. engaged in prostitution from approximately October 2011 to December 2011.

During this period of time, S.T. was staying at defendant's house and Tyrone's house. When she stayed at defendant's house, she stayed in his room with him. S.T. testified that defendant's bedroom was on the ground floor, "[r]ight next to" the garage. They entered the home through the garage. C.T. would sometimes stay in that room as well. They would all sleep in defendant's bed. S.T. testified at trial that she had sex with defendant on one occasion.[3] Defendant told her that he was "testing [her] to see if it was easy for [her] to have sex with clients." S.T. was not sure whether she ever saw

---

[3] At the preliminary hearing, S.T. testified that she did not recall ever having sex with defendant.

defendant and C.T. having intercourse. However, S.T. saw "a lot of movements on the bed," leading her to believe that defendant had sex with C.T.

Eventually, S.T. stopped participating in prostitution. S.T. was at defendant's house when defendant told her that C.T. and Stephen had been contacted by a police officer and that they had to go because S.T. and C.T. were "hot right now." S.T. assumed that meant that the police were looking for them. Defendant took S.T. to Tyrone's house. That was the last time S.T. saw defendant until trial.

Detective Derek Stigerts, assigned to the FBI's Innocence Lost Task Force dealing with juvenile prostitution cases, testified as an expert in juvenile prostitution. Among other things, Stigerts testified that it was uncommon for prostitutes to buy food for their pimp out of respect. He testified that, customarily, pimps have the money, and therefore "it's usually the other way around . . . ," although he testified that he had "seen where it does happen."

Officer Noah Winchester of the Los Rios Police Department, which worked directly for the Los Rios Community College District, testified that, on December 7, 2011, he was on patrol at Cosumnes River College. A vehicle drove by playing loud music. Winchester initiated a traffic stop. The driver of the vehicle appeared to be nervous. Winchester identified the driver as Stephen. A female passenger, who looked very young and who Winchester thought may be truant from a local school, appeared to be "overly nervous." Her hands were shaking, her eyes were darting around, and she could not sit still. Winchester asked the passenger to step away from the vehicle and accompany him to his vehicle. She initially told Winchester her name was S.T. After Winchester warned her that providing false information to the police is a crime, the passenger stated that her name was C.T., and gave her date of birth, indicating that she was 14 years old. Winchester searched C.T.'s purse and discovered several emergency contraceptive pills, 20 to 30 condoms, and other items of that nature. Winchester placed C.T. in the back of his patrol car and returned to Stephen.

6

Winchester noticed that Stephen's phone was ringing continuously. Stephen gave Winchester permission to look at his phone, and Winchester observed that there were a number of missed calls. The caller ID identified the caller as "Tony Khong." Additionally, Winchester saw a text message on the phone from "Tony Khong" which read, "grab the girl and dip, Nigga." In Winchester's experience, that message would be telling the recipient to "go, run." Winchester testified that this text message was received during the time the vehicle stop was ongoing. Winchester obtained a photograph of defendant and showed it to C.T. She identified the individual in the photograph as defendant. Winchester contacted C.T.'s father, as C.T. had been reported missing on November 10, 2011.

C.T.'s father testified that he was contacted by the Los Rios Police Department on December 7, 2011, and that the police indicated that they had his missing daughter. He picked her up and returned with her to their home in Oroville.

Sergeant Jeff Morris of the Sacramento Police Department testified that, on or around December 19, 2011, he began investigating allegations of pimping, pandering, and human trafficking of minors by defendant. Morris spoke with Winchester about his encounter with Stephen and C.T. Morris obtained a statement from C.T. on January 17, 2012, at her residence in Oroville. At that time, C.T. was 15 years old. A little over a month later, Morris interviewed S.T. at her residence. She was also 15 years old at that time.

Eventually, C.T. ran away from home again. At the time of trial, C.T.'s father had not spoken with her in about a week, and he had not seen her for three months. He did not know her whereabouts.

Cathy Barker was employed by the Sacramento County District Attorney's Office, and she was assigned to assist in the investigation of this case. She had met with C.T. three times between March and June 2013. Barker described her subsequent attempts to get C.T. to appear at the preliminary hearing in this case. On the night before the

7

preliminary hearing, C.T. contacted Barker and told her that she would appear at the hearing, but, the following day, she did not show up. Barker and other authorities continued to look for C.T. as the trial date approached, but they were unable to find her, and she did not testify at trial.

## Defendant's Case

Muey Saetern testified that she was married to defendant's brother. Until 2013, she and her husband and their four children lived in the same house as defendant as well as defendant's father. As of October 2011, Saetern only worked a few days a month, and, otherwise, she would be at home. Saetern testified that, during the period between October and December 2011, she never saw defendant bring any girls home. She testified that, had defendant brought girls or women home, she would have remembered it. Saetern had not heard of C.T. or S.T., and she never saw either of those girls at the house. However, Saetern also testified that defendant's bedroom was on the ground floor and all the other bedrooms were on the second floor. She also said defendant's room was located near the door to the garage.

Lani Khong,[4] defendant's sister, testified that she was at the house in which defendant lived three or four times a week during the period between October and December 2011. She never saw defendant bring girls to the residence. Lani had not heard of C.T. or S.T. Lani testified that there was a general restriction in the house that defendant could not have people over because of the children who lived there.

## Stipulation

The prosecution and the defense stipulated that, if Detective Morris was recalled, "he would testify that on February the 6th of 2012, he contacted Muey Saetern at the . . .

---

[4] Because she shares the same last name with defendant, we refer to this witness by her first name.

residence [where defendant lived], wherein she stated that [defendant] does not work and gets home late at night and leaves the residence in the morning."

## Verdict and Sentencing

The jury returned verdicts, finding defendant guilty of two counts of pimping a minor under 16 years of age (§ 266h, subd. (b)(2) (counts one & two)), one count of pandering a minor under 16 years of age (§ 266i, subd. (b)(2) (count four)), and two counts of human trafficking a minor (§ 236.1, subd. (c)(1) (counts seven & eight)). The jury found defendant not guilty of one count of pandering a minor under 16 years of age. (§ 266i, subd. (b)(2) (count three).) The jury could not reach a verdict on count five, unlawful sexual intercourse with a minor under 16 years of age (§ 261.5, subd. (d)), and the trial court declared a mistrial as to that count. On the prosecution's motion, count five was later dismissed in the interest of justice.

The trial court found the allegation of defendant's prior strike conviction of burglary in the first degree to be true. Defendant's *Romero* motion[5] to dismiss the strike conviction was denied.

The trial court sentenced defendant to an aggregate term of 20 years calculated as follows: the upper term of eight years on count seven, human trafficking a minor (§ 236.1, subd. (c)(1)), doubled to 16 years for the prior strike conviction, and a two-year consecutive term (one-third the midterm) on count eight, human trafficking a minor (§ 236.1, subd. (c)(1)), doubled to four years for the prior strike conviction. With regard to counts one, two, and four, the court stated: "I think I will not sentence. I'm going to stay those pursuant to 654 rather than to sentence."

---

[5] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.

9

## DISCUSSION

### I.  Prosecutorial Misconduct

### A.  Defendant's Contentions

Defendant contends the prosecutor committed multiple acts of prejudicial misconduct in her closing argument.  Specifically, defendant contends that the prosecutor committed misconduct by:  (1) employing a puzzle analogy in closing argument that reduced the burden of proof; (2) referring to matter outside of the record to establish S.T.'s veracity; and (3) appealing to the passions of the jurors.  Defendant did not object at trial and thereby failed to preserve for appellate review his right to challenge the alleged misconduct.  In any event, we conclude that defendant's contentions are without merit, or that any misconduct was not prejudicial.

### B.  Additional Background

### 1.  Relevant Jury Instructions

In its jury charge, the trial court instructed the jury with CALCRIM No. 220 as follows:  "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true.  You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.  [¶]  A defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.  [¶]  Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.  [¶]  In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt,

he is entitled to an acquittal and you must find him not guilty." (CALCRIM No. 220, as given to the jury in this case.)

The court also instructed the jury, as set forth in a portion of CALCRIM No. 222, that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys may have asked a question that suggested it was true." (CALCRIM No. 222, as given to the jury in this case.)

Also, the court instructed the jury from CALCRIM No. 200 as follows: "Do not let bias, sympathy, prejudice, or public opinion influence your decision. . . . [¶] You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

### 2. The Closing Arguments

As the prosecutor commenced her closing argument, she told the jury: "During jury selection, I told you that I'm a Deputy District Attorney, a prosecutor for Sacramento County. As a prosecutor, it is my job to prosecute crimes against our community. [¶] The crimes of pimping, pandering, human trafficking and statutory rape are not only crimes committed against the unfortunate juvenile victims, but rather, they are crimes committed against our community. [¶] That pricinp[le] holds true especially if you are a 14- or a 15-year-old girl from an immigrant family. When crimes are committed against the weakest and most vulnerable victims of our community, it offends our peace and it offends our dignity. It begs for justice not only for [C.T.] and for [S.T.], but for every single one of us in our community." She continued: "All of you got a glimpse into a segment of our community that many of you would never have witnessed but for being

11

jurors in this case.  [¶]  You got a front row seat to a bitter reality for some children in our community."  As she proceeded in her closing argument, the prosecutor stated, "What you saw in this courtroom is the true, real-life reality.  It's gritty, it's cold, and it's dark.  You probably could not identify with [S.T.]'s situation.  She's nothing like you."  The prosecutor went on to explain, "[N]o one is beneath the law.  What that means, you don't have to be beautiful.  You don't have to be smart.  You don't have to be articulate.  You don't have to have a mom that loves you to deserve equal justice under the law."  The prosecutor further reiterated, "Pimping, pandering, human trafficking and statutory rape are sex crimes, and they're committed against our community, and they offend the dignity and peace and spirit of the human soul."  The prosecutor then followed that statement with, "I ask you to consider and treat [S.T.] and [C.T.] with the same dignity and empathy that they deserve because they are human beings."

During a subsequent portion of her closing argument, after discussing S.T.'s testimony at length, the prosecutor stated:  "I just want to bring up one little -- little point here.  [¶]  It is very difficult to talk about sex in public.  [¶] . . . [¶]  Just think about this.  [¶]  In your day-to-day life, how often are you discussing at length, in detail sex?  [¶]  When I went to a training course one time for this continuing education, we have to do this for our Bar -- to keep our Bar card.  During the training course -- it was a sexual assault, prosecution training course -- and the instructor -- it was a small group, but -- probably about 30 of us.  [¶]  We're all at the little tables, and the instructor says okay.  Right before lunch he says, you know, we're going to take a break.  We're going to have lunch.  [¶]  When we come back, I want you to be prepared to discuss the following:  [¶]  I'm going to choose one of you to sit at this chair at the front of the room, and I want you to be -- to be prepared to discuss your last sexual experience with the entire class.  [¶]  I'm going to ask you when it was.  I'm going to ask you where it was.  I'm going to ask you who it was with.  I'm going to ask you what you did.  I'm going to ask you all of the sexual stuff that happened during that.  I'm going to ask you all the details.  [¶]  So be

prepared to discuss that, and I'll be picking one of you. [¶] . . . [¶] I come back after lunch, about ten absent people didn't come back. [¶] And the instructor said to us, he's like how did that make you feel? [¶] . . . [¶] He's, like, I'm not going to call one of you by the way. I wanted you -- I wanted to know what that made you feel like, because that is what the victim of a sexual offense will go through when she comes into the courtroom and she's questioned at length for perhaps a day, direct examination, cross-examination, redirect on all the specific details of that incident. [¶] It's not an easy thing to do, Ladies and Gentlemen, let alone a young girl who, as you know, is not a very articulate person and not articulate about these [*sic*] sexual stuff . . . . [¶] This wasn't easy, and at any point in time [S.T.] could have pulled the plug and said okay. She didn't. And I think that's something, when you judge credibility, you should consider." The defense did not object to these comments.

After discussing the elements of the human trafficking counts involving S.T. and C.T., the prosecutor stated: "Consider everything in this case. You know, it's almost like a puzzle. You've got certain pieces here and certain pieces there, and when you kind of put the edges of that puzzle together -- that's usually how I do a puzzle. I'm not sure about you -- you do the edges first, you put all the same colors together, and then ultimately you complete that puzzle. [¶] Sometimes you're missing a piece. [¶] You ever do that, when you're putting a puzzle together and you're, like, darn it. I'm missing that one piece right there. But you still know what the puzzle -- the picture in the puzzle is, whether it's like an Eiffel Tower or -- [¶] Last summer we were in Maui, and we -- there is a bunch of flip flops that we had. We were missing the toe part of one of the flip flops. We still knew they were flip flops. [¶] Now we're missing [C.T.], but we sure have a clear picture of what that game was about even without her.[6] [¶] Ladies and

---

[6] Defendant omitted reference to this critical sentence in his appellate briefing.

13

Gentlemen, I'm confident when you go back and deliberate, you'll have no other choice but to find the defendant guilty of every single crime charged. [¶] Thank you." Again, the defense did not object to these comments.

Later, after the prosecutor finished her initial closing argument and the jurors were excused for the day, defense counsel noted that the trial court had asked in chambers whether defense counsel had a problem with the prosecutor's closing argument. Counsel recognized that the prosecutor's Eiffel Tower puzzle analogy was reminiscent of the prosecutor's argument in this court's opinion in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 (*Katzenberger*). In *Katzenberger*, the prosecutor used a visual display of a puzzle being assembled to reveal an image of the Statue of Liberty. (*Id*. at pp. 1266-1267.) The display in *Katzenberger* also employed a quantitative component in that, once six pieces of the eight-piece puzzle were displayed, the prosecutor informed the jury: " 'this picture is beyond a reasonable doubt,' . . . ." (*Id*. at p. 1268.) This court concluded that the prosecutor committed misconduct because the "prosecutor's use of an easily recognizable iconic image along with the suggestion of a quantitative measure of reasonable doubt combined to convey an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt." (*Ibid*.) Here, defense counsel summarized his recollection of the issue discussed in *Katzenberger*, stating that he was "bring[ing] that to the Court's attention because should there be an appeal in this case, an appellate attorney and the Appellate Court will certainly look at that. And it will be an argument made by the appellate attorney for the defense that somehow lowers the burden of proof, and *that is not the way I take the argument*. [¶] But I wanted to make sure that there was a clear record on that case." (Italics added.)

The trial court stated that it had the same thought, but the prosecutor's argument here was different. The court further stated that, had the court thought the prosecutor was reducing the burden of proof, the court would have intervened.

For her part, the prosecutor said she did not display an image of the Eiffel Tower on the PowerPoint slides. She said, "The only words that were on the Power[P]oint were reasonable doubt."[7]

During his closing argument, defense counsel emphasized the burden of proof. He stated: "Now, in criminal cases, the Prosecution has a heavy, heavy burden of proving the charges beyond a reasonable doubt. It's the highest standard allowed by law. [¶] And it's such a high standard that the District Attorney gets to make a rebuttal argument, the arguments I've made now, and that's only fair because she has that extremely high burden of proof. [¶] Many times I hear District Attorney[]s say well, you know, people get convicted everyday [sic] in this courthouse using that standard, to which my response is, you know, juries everyday [sic] acquit people in this courthouse using that same standard. It cuts both ways. [¶] Now, you might be saying to yourself what is this reasonable doubt that I keep hearing about? [¶] As the Court has instructed you, proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] . . . [¶] This is the highest standard allowed by law, and it's not a standard you use everyday [sic] in your daily lives."

## C. Standard of Review

" ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the

---

[7] The record does not contain a paper copy of the PowerPoint slides used by the prosecutor during closing argument. Other than the prosecutor's statement, no other evidence appears in the record as to what was displayed to the jury at the time the prosecutor made the comments to which defendant now objects.

use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " [Citation.] *To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.* [Citation.]' [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*), italics added.)

## D. Analysis

### 1. Puzzle Analogy - Reducing the Burden of Proof

Defendant asserts that the prosecutor's use of the puzzle analogy diminished the burden of proof by equating proof beyond a reasonable doubt to a matter used in trivial everyday decision-making. Defendant asserts that this misconduct was prejudicial under either the federal or state standard.

Initially, the People assert that defendant forfeited this claim. In this regard, the People assert that, while defense counsel at trial called attention to the matter, he did not, in fact, assert that the prosecutor's remarks constituted misconduct, and he did not request any admonition in reference to these remarks. We agree.

As we have noted, counsel did not object to the prosecutor's remarks, and did not request any admonition or curative instruction. Rather, he simply referred to *Katzenberger*, stating that he was "bring[ing] that to the Court's attention because should there be an appeal in this case, an appellate attorney and the Appellate Court will certainly look at that. And it will be an argument made by the appellate attorney for the defense that somehow lowers the burden of proof, and *that is not the way I take the*

16

*argument.* [¶] But I wanted to make sure that there was a clear record on that case." (Italics added.) Having declined to actually object to the prosecutor's remarks or request any sort of admonition, defendant forfeited this claim on appeal.[8] (*Linton, supra*, 56 Cal.4th at p. 1205.) In any event, and to resolve defendant's claim that his trial counsel was constitutionally ineffective for failing to object to the alleged instances of prosecutorial misconduct,[9] we conclude the comments were not prejudicial.

In *Katzenberger*, the prosecutor displayed a PowerPoint presentation in closing argument which began with a blue screen, and, as the presentation continued, six puzzle pieces appeared on the screen sequentially. (*Katzenberger, supra*, 178 Cal.App.4th at p. 1264.) The image of the Statue of Liberty displayed in the presentation was "immediately and easily recognizable . . . ." (*Ibid.*) When six of the eight pieces of the puzzle were displayed, over defense counsel's objection "[t]he prosecutor went on to tell the jury that '[w]e know [what] this picture is beyond a reasonable doubt without looking at all the pieces of that picture. We know that that's a picture of the Statue of Liberty, we don't need all the pieces of the [*sic*] it. And ladies and gentlemen, if we fill in the other two pieces [at this point the prosecutor apparently clicks the computer mouse again, which triggers the program to add the upper left-hand rectangle that includes the image of the torch in the statue's right hand and the central rectangle that completes the entire

---

[8] Defendant asserts that objection would have been futile because the court made comments indicating that it did not believe the argument here was as problematic as that in *Katzenberger*. We disagree. Indeed, it appears from defense counsel's comment that the trial court invited defense counsel to object in chambers when it asked if defense counsel had a problem with the prosecutor's closing argument. If defense counsel thought the comments were objectionable, he could have registered a formal objection supported by a discussion of *Katzenberger* and other cases and requested an admonition and appropriate curative instructions. Because we cannot assume that an objection and admonition would have been futile, defendant has forfeited this claim of misconduct. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 201.)

[9] More specifically discussed in part II of the Discussion, *post*.

image of the statue], we see that it is, in fact, the [S]tatue of [L]iberty.  And I will tell you in this case, your standard is to judge this case beyond a reasonable doubt.'  The prosecutor argued such standard was met by the evidence." (*Id*. at p. 1265.)

In concluding that the prosecutor committed misconduct, this court stated:  "The Statue of Liberty is almost immediately recognizable in the prosecution's PowerPoint presentation.  Indeed, some jurors might guess the picture is of the Statue of Liberty when the first or second piece is displayed.  We have viewed the PowerPoint at issue and we believe most jurors would recognize the image well before the initial six pieces are in place.  The *presentation, with the prosecutor's accompanying argument*, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence.  It invites the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Katzenberger, supra*, 178 Cal.App.4th at pp. 1266-1267, italics added.)  Additionally, the *Katzenberger* court took issue with the quantitative aspect of the display.  This court stated that "the puzzle of the Statue of Liberty is composed of eight pieces.  When the sixth puzzle piece of the slide show was in place, leaving two missing pieces, the prosecutor told the jury, 'this picture is beyond a reasonable doubt,' inappropriately suggesting a specific quantitative measure of reasonable doubt, i.e., 75 percent." (*Id*. at pp. 1267-1268.)  This court concluded:  "The prosecutor's use of an easily recognizable iconic image along with the suggestion of a quantitative measure of reasonable doubt combined to convey an impression of a lesser standard of proof than the constitutionally required standard of proof beyond a reasonable doubt.  The prosecutor committed misconduct." (*Id*. at p. 1268.)  However, the *Katzenberger* court then went on to conclude that the prosecutor's misconduct was not prejudicial. (*Id*. at p. 1269.)

Similarly, in *People v. Otero* (2012) 210 Cal.App.4th 865 (*Otero*), on which defendant also relies, the prosecutor displayed a PowerPoint slide of a map containing the

"readily recognized outline of California" next to the outline of Nevada. (*Id*. at pp. 869, 873.) The map showed, among other things, a star with the word " 'Sac' " where Sacramento would be, " 'San Francisco' " and " 'San Diego' " inside the outline of California, although they were in incorrect locations, " 'Los Angeles' " in the southern part of the state, and the word " 'Ocean' " to the left of the state where the Pacific Ocean would be. (*Id*. at pp. 872-873.) At the bottom of the map appeared the statement: " 'Even with incomplete and incorrect information, no reasonable doubt that this is California.' " (*Id*. at p. 869.) The prosecutor, having told the jury that she wanted to provide an example of reasonable doubt, stated, " 'Is there any doubt in your mind, ladies and gentlemen, that that state is California? Okay. Yes, there's inaccurate information. I know San Diego is not at the northern part of California, and I know Los Angeles isn't at the southern. Okay. But my point to you in this—' " At that point, defense counsel objected and the trial court ordered the PowerPoint slide be taken down. After discussion outside the presence of the jury, the trial court told the jury to disregard the map as well as the prosecutor's argument and to follow the definition of reasonable doubt it had provided. (*Id*. at p. 870.)

The Court of Appeal, relying on, inter alia, *Katzenberger*, concluded that the prosecutor committed misconduct. (*Otero, supra*, 210 Cal.App.4th at p. 873.) The court stated: "The use of a diagram such as the one used in this case is simply not an accurate analogy to a prosecutor's burden to prove beyond a reasonable doubt each and every element of a charged offense. Here the diagram was identifiable using but one of eight pieces of information supplied by the diagram (12.5 percent of the information supplied) and unlike the puzzle in *Katzenberger*, where all pieces contained accurate information, here the diagram contained inaccurate information, making the error more egregious. Not only is the standard of proof reduced to substantially below the condemned percentage in *Katzenberger*, but the jury was informed that reasonable doubt may be reached on such slight proof even when some of the evidence is demonstrably false."

19

(*Otero*, at p. 873.) However, the *Otero* court found the misconduct to be harmless in light of the trial court's instructions, including the curative instruction. (*Ibid*.)

Assuming the prosecutor's use of the puzzle analogy here (orally comparing the case to a puzzle with an unknown number of pieces depicting an image of the Eiffel Tower at the same time the words "reasonable doubt" are displayed) constituted the same sort of misconduct as was found in *Katzenberger* and *Otero*, we conclude that any such misconduct was not prejudicial.

Defendant asserts that the misconduct requires reversal under any standard. The People counter that defendant's federal constitutional right to a fair trial was not violated, and therefore the federal "harmless beyond a reasonable doubt" error standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (*Chapman*), is inapplicable. Instead, the People assert that we must determine whether any error was prejudicial under the state standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

We conclude that the alleged misconduct was not prejudicial under either standard. (See *Katzenberger, supra*, 178 Cal.App.4th at p. 1269.) There was ample evidence of defendant's guilt of two counts of pimping a minor under 16 years of age (§ 266h, subd. (b)(2)), one count of pandering a minor under 16 years of age (§ 266i, subd. (b)(2)), and two counts of human trafficking a minor (§ 236.1, subd. (c)(1)).

S.T. testified that, at some point during the time period between October and December 2011, defendant had a conversation with her about how she could earn money. Defendant told S.T. that she "could either do this or [she] can just work at the strip bar." When defendant stated she could "do this," S.T. assumed that he was referring to prostitution. Although S.T. initially refused, after considering the matter for some time, S.T. "decided to do it." She felt that she could no longer let C.T. do everything for her, and that she needed to contribute.

S.T. never obtained her own customers or made the arrangements to meet them. It was defendant who made the arrangements. S.T. described how that worked. Defendant would receive a phone call, leave the room, return, and tell S.T. and C.T. that they had work. Defendant would either then drive S.T. and/or C.T. to the motel, or he would have Tyrone or Stephen do so. Once at the motel, S.T. would accompany the client to a motel room where she would engage in vaginal or anal intercourse with the client. S.T. would use condoms furnished by defendant, Tyrone, or Stephen. Defendant would be waiting outside when they were done. Generally, S.T. would receive $40 for each occurrence. She would give defendant $20 for gas and for "respect." But when the customer paid defendant, defendant gave S.T. $40.

S.T.'s testimony was corroborated by the testimony of Officer Winchester, who pulled over a vehicle driven by Stephen, in which C.T. was a passenger. Winchester discovered several emergency contraceptive pills, 20 to 30 condoms, and other items of that nature in C.T.'s purse. When Winchester looked at Stephen's phone, which had rang continuously during the stop, he observed that there were a number of missed calls from an individual with defendant's name. Additionally, Winchester saw a text message on the phone from that individual, which stated, "grab the girl and dip, Nigga." This event was consistent with S.T.'s testimony that defendant was working with Tyrone and Stephen. Winchester showed C.T. a photograph of defendant and she identified him.

Additionally, although defendant's family members testified they saw no girls visiting defendant in the home where he lived, S.T.'s description of the location of defendant's bedroom within the home was consistent with the how Saetern described the home. Furthermore, from the evidence of the layout of the house, sleeping arrangements and stipulated fact that defendant stayed out late at night, it can be reasonably inferred that defendant was able to smuggle the girls in while the other occupants of the house slept upstairs.

21

Moreover, defense counsel in closing emphasized at length the beyond a reasonable doubt burden of proof, and the trial court accurately instructed the jury with CALCRIM No. 220.  Also, using CALCRIM No. 200, the trial court accurately instructed the jury to disregard anything the attorneys might say that conflicts with the court's instructions.

As this court stated in *Katzenberger*, " '[A]rguments of counsel "generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." [Citation.]'  [Citation.]  'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' "  (*Katzenberger, supra*, 178 Cal.App.4th at p. 1268.)

Furthermore, unlike the circumstances in *Katzenberger* and *Otero*, where the prosecutors directly and expressly related their analogies and visual presentations to the reasonable doubt instruction, here, the prosecutor did not display a puzzle or a clearly recognizable depiction.  Nor did she verbally reference the reasonable doubt standard discussing the puzzle analogy, although admittedly, the words "reasonable doubt" were displayed on the screen during her comments.  Rather the focus of the prosecutor's comments was C.T.'s absence as a witness at trial as the missing puzzle piece.  Specifically, the prosecutor said, "Now we're missing [C.T.], but we sure have a clear picture of what that game was about even without her."  Rather than the reasonable doubt instruction, these remarks related more directly to the instruction that tells the jury neither side is required to call all witnesses who may have information (CALCRIM No. 300), or the instruction that the testimony of one witness can prove any fact.  (CALCRIM

22

No. 301.)  In any event, unlike in *Katzenberger* and *Otero*, the prosecutor's remarks did not expressly relate to the reasonable doubt instruction; nor did they impact the jury's understanding thereof or otherwise diminish the burden of proof.

We conclude, beyond a reasonable doubt, that the jury would have found defendant guilty in the absence of the prosecutor's remarks in closing argument. (*Katzenberger, supra*, 178 Cal.App.4th at p. 1269; see generally *Chapman, supra*, 386 U.S. at p. 24.)  Thus, we conclude that any misconduct based on this portion of the argument was not prejudicial.

### 2.  Referring to Matters Outside the Record/Improper Vouching

Defendant asserts that the prosecutor also committed misconduct by referring to matters outside the record in order to demonstrate S.T.'s veracity.  Specifically, defendant contends that the prosecutor's description in her closing argument of her experience at a continuing legal education program concerning how difficult it may be to speak publicly about sexual experiences improperly suggested to the jury that the prosecutor had an experience in common with S.T., constituted a form of vouching for S.T.'s veracity, and encouraged the jurors to view the matter from S.T.'s perspective.

Defense counsel made no objection to these remarks during the prosecutor's closing argument.  Consequently, defendant has forfeited this contention.  (*Linton, supra*, 56 Cal.4th at p. 1205.)

In any event, " ' "[a] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.]  "A prosecutor may 'vigorously argue his [or her] case and is not limited to "Chesterfieldian politeness" ' [citation] . . . ." ' [Citation.]  Nevertheless, '[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise

23

bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of [his [or her]] office behind a witness by offering the impression that [he [or she]] has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [his [or her]] comments cannot be characterized as improper vouching.' " (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

We disagree with defendant's characterization of the prosecutor's remarks as addressing facts not in evidence and vouching for S.T.'s veracity or credibility. Rather, we consider these remarks to be illustrative of the difficulty a witness in S.T.'s circumstances could have in testifying about sensitive and potentially embarrassing matters. In light of the wide latitude afforded advocates during argument, we are of the opinion that, here, the prosecutor did not substantively raise facts beyond the evidence, but rather the argument illustrated something that is a matter of common knowledge and experience, specifically that it would be awkward and difficult to discuss sensitive matters of a sexual nature before a room of strangers. (See *Ward, supra*, 36 Cal.4th at p. 215; see also *People v. Loker* (2008) 44 Cal.4th 691, 742 [in discussing the subject of a book, prosecutor did not refer to facts beyond the evidence, but to a viewpoint that was a matter of common experience].) In telling the story about the embarrassment a person can feel when asked to tell strangers about the details of an intimate sexual act, the prosecutor was doing nothing more than giving a permissible illustration of human nature drawn from common knowledge and experience. (See *People v. Hill* (1998) 17 Cal.4th 800, 819.) Thus, contrary to defendant's contention, the prosecutor was not improperly vouching for S.T.'s veracity or credibility. Moreover, the record demonstrates that the prosecutor did not appeal to the jurors to find defendant guilty based on sympathy or

24

placing themselves in S.T.'s position. (See generally *People v. Arias* (1996) 13 Cal.4th 92, 160.)

In any event, even if we determined that the prosecutor committed misconduct through the description of her experience in a continuing legal education program, we would conclude that such misconduct was harmless. This misconduct did not implicate defendant's constitutional right to a fair trial or render his trial fundamentally unfair. Accordingly, the state standard set forth in *Watson, supra*, 46 Cal.2d 818 applies. Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id.* at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

Based on the evidence discussed *ante*, we conclude that it is not reasonably probable that the jury would have reached a result more favorable to defendant if the prosecutor had not made the argument about which defendant belatedly complains. (*Watson, supra*, 46 Cal.2d at pp. 835-836.) Furthermore, as we have noted, the trial court explicitly instructed the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." (CALCRIM No. 222, as given to the jury in this case.) Additionally, the trial court instructed the jury that it was not to "let bias, sympathy, prejudice, or public opinion influence your decision." (CALCRIM No. 200, as given to the jury in this case.) We presume that the jury followed the instructions given by the trial court. (*Katzenberger, supra*, 178 Cal.App.4th at p. 1269.) Any misconduct by the

prosecutor in describing her experience in the continuing legal education class did not prejudice defendant.

### 3. Appeals to the Jurors' Passions

Defendant asserts that the prosecutor committed misconduct in appealing to the passions of the jurors during her closing argument. In this regard, defendant observes that the prosecutor repeatedly invoked the notion that the crimes committed here were not merely committed against the two victims, but against the community itself. According to defendant, the prosecutor's repeated references to the crimes having been committed against the community "urged the jurors to convict this defendant in order to protect community values."

Defense counsel made no objection to these remarks in the prosecutor's closing argument. Consequently, defendant has forfeited this contention as well. (*Linton, supra*, 56 Cal.4th at p. 1205.)

" 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*Linton, supra*, 56 Cal.4th at p. 1210.) Defendant is correct that a prosecutor may not urge jurors to convict a criminal defendant in order to protect community values. " 'The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.' " (*United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, 1149, quoting *United States v. Monaghan* (D.C. Cir. 1984) 741 F.2d 1434, 1441, fn. omitted.)

While the prosecutor's comments to which defendant objects here may have veered close to the line, the challenged remarks served the valid purpose of emphasizing the jury's responsibility to see that justice is served despite these particular victims' standing in society as runaways who engaged in acts of prostitution. In other words, the remarks emphasized that these victims should be treated like every other victim in the eyes of the law. As the prosecutor noted, "no one is beneath the law. What that means, you don't have to be beautiful. You don't have to be smart. You don't have to be articulate. You don't have to have a mom that loves you to deserve equal justice under the law." Moreover, the prosecutor made no mention of defendant's guilt when she made these remarks, so there was no express suggestion that the jury should convict defendant to protect the community. The comments did not amount to misconduct.

Even were we to conclude that these remarks constituted misconduct, defendant did not sustain any prejudice. Based on the evidence presented, it is not reasonably probable that, had the prosecutor not referred to the crimes committed against the community on a number of occasions, the jury would have reached a result more favorable to defendant. (*Watson, supra*, 46 Cal.2d at pp. 835-836.) Additionally, the trial court instructed the jury that it was not to "let bias, sympathy, prejudice, or public opinion influence your decision." (CALCRIM No. 200, as given to the jury in this case.) Again, we presume that the jury followed the instructions given by the trial court. (*Katzenberger, supra*, 178 Cal.App.4th at p. 1269.) Defendant was not prejudiced by this alleged misconduct.

### 4. Cumulative Effect of Alleged Prosecutorial Misconduct

Defendant also asserts that the cumulative effect of the prosecutorial misconduct resulted in a significant impact on the jury's verdict, and that reversal is required. (*People v. Jasso* (2012) 211 Cal.App.4th 1354, 1378.) We disagree. We have reviewed all of defendant's claims and find no cumulative prejudicial error warranting reversal. (*People v. Tully* (2012) 54 Cal.4th 952, 1048.)

## II. Ineffective Assistance of Counsel

Acknowledging that his trial attorney did not object to most or all of the alleged instances of prosecutorial misconduct, did not request any admonishments, and did not request any curative instructions, defendant asserts that he was denied his constitutional right to the effective assistance of counsel.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 693-694, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, ___ [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

In parts I.D.2. and I.D.3. of the Discussion, *ante*, we have concluded that the instances raised by defendant did not constitute prosecutorial misconduct. Counsel cannot be faulted for abstaining from futile or meritless objections. (*People v. Price* (1991) 1 Cal.4th 324, 386-387; see also *People v. Stratton* (1988) 205 Cal.App.3d 87, 97.) Accordingly, in connection with these contentions, we conclude that counsel's performance did not fall below an objective standard of reasonableness.

Even assuming the prosecutor's closing arguments constituted misconduct as asserted by defendant, and further assuming trial counsel was deficient for failing to object, there is no basis for reversal because defendant has not established prejudice by showing it is reasonably probable that he would otherwise have obtained a more favorable result.

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 178 L.Ed.2d at p. 642.) To show prejudice, defendant must show a reasonable probability that he would

have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

We have concluded, *ante*, that, even assuming the prosecutor committed misconduct as alleged by defendant, he was not prejudiced as a result of these instances of misconduct, individually or cumulatively. For the same reasons we discussed in concluding that any instance of prosecutorial misconduct did not result in prejudice to defendant, in connection with his contention that he was denied the effective assistance of counsel, we also conclude that defendant has not shown a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

### III. Sentencing

### A. Imposition of an Upper Term Sentence

### 1. Additional Background

After counsel made their arguments at the sentencing hearing, the trial court remarked about how childlike S.T. looked in a photograph introduced into evidence that was taken of her when she was first interviewed by the police. "And I'm looking in the face of somebody who could have been ten, innocent, child-like face, dressed in Hello Kitty pajama bottoms. That's what I will take from this case, that photograph. [¶] And if you're not moved by that photograph, nothing will move you, because you look in the face of a child. She was a child, 14 years of age. She can't volunteer. She can't consent. [¶] My goodness. In the testimony, she didn't know what it meant when somebody asked her if she had vaginal sex. [¶] What does that mean? [¶] What is that? [¶] She didn't know. She's a kid. She's a child, and *she was incredibly vulnerable in this case*." (Italics added.) The trial court went on to say, "[S]he was certainly let down by her mother, making her *one of the most vulnerable victims that I've seen in this courtroom*, save one that I remember with crystal clarity. [¶] And then along came a spider, and the

29

spider was Mr. Khong who decided he would take advantage of an opportunity, and take advantage he did. [¶] And by taking these children and pimping and pandering and human transporting them, it's hard to imagine that someone can so turn off their emotions and carry on in that manner. [¶] And yes, you're sniffling today, Mr. Khong. You have -- you have Kleenex because your -- your eyes well up, but they didn't seem to when you took these girls and you did what you did in the manner that calls for a punishment of the appropriate type." (Italics added.)

After finding that defendant was not eligible for probation, the trial court stated its reasons for imposing the upper term. "I find that the circumstances in aggravation here were that *these victims were particularly vulnerable for the reasons I just stated. Both were runaways in need of money.* [¶] I'm following the MATTERS that are outlined in the probation report, but they are certainly in keeping with my findings as I listened to this trial. [¶] The defendant induced others to participate in the commission of the crime or got on a cell phone, talked in Vietnamese to [the customers], and then the [customers] would show up magically at the hotel where he would then drive or have someone else drive the children to be raped by these men, to be -- to have intercourse with these men. [¶] The manner in which the crimes were carried out certainly had planning and sophistication and professionalism. He knew exactly what he was doing and exactly how to do it. It worked with clockwork precision really, which is devastating. [¶] And these little girls, the one here doesn't even know what it means to have vaginal sex, is being put into the room with these men and treated as they did. [¶] Tony Khong's prior convictions as an adult and his sustained petitions in juvenile delinquency proceedings are numerous and are of increasing seriousness, the most recent felony of which was a residential burglary. And we heard the facts and circumstances that were presented by [the prosecutor], very serious. And for that, he served a prior prison term -- not very long -- got out just a couple of years ago. [¶] He was on parole and informal probation when these crimes were committed, and his prior performance on parole and probation, of

30

course, were dismal, and his prior performance on juvenile probation was also unsatisfactory." The court then noted two circumstances in mitigation: positive letters from various people and, although defendant was 25 years old, the court noted that "he's particularly youthful." The court then said, "But I think if anyone's earned the upper term, it is this defendant." After imposing the upper term doubled, the court added, "The upper term is certainly appropriate in this case because the defendant was on parole when the crimes were committed, the crimes against children were committed and because of his prior experience as a criminal, both as a juvenile and as an adult."

### 2. Analysis

Defendant asserts that the trial court abused its discretion in imposing the upper term sentence on count seven, resulting in an aggregate term of 20 years imprisonment. Defendant contends that the facts of this case were not particularly aggravating, and emphasizes that he was not found to have used violence or to have kidnapped the minor victims. Defendant further asserts that the trial court impermissibly used the victims' youth as an aggravating factor. According to defendant, the trial court should have imposed the middle term of six years, doubled to 12 years, resulting in an aggregate sentence of 16 years.

"We review the trial court's exercise of discretion at sentencing for abuse. [Citations.] We are required to presume the trial court acted to achieve legitimate sentencing objectives. [Citation.] A ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.]" ' [Citation.] We may displace the trial court's decision only if there is a clear showing the sentence was arbitrary or irrational. [Citation.] A trial court abuses its discretion if it relies upon circumstances that are not relevant to, or that otherwise constitute an improper basis for, the sentencing decision." (*People v. Shenouda* (2015) 240 Cal.App.4th 358, 368-369.)

We conclude that defendant has failed to establish the existence of any grounds by which he could satisfy his burden of demonstrating that the trial court abused its discretion and that its sentencing decision was arbitrary or irrational. Defendant appears to specifically contend the trial court abused its discretion in sentencing him because it improperly relied on the victims' youth as an aggravating factor, whereas their status as minors was an element of the charged offenses. However, as can be seen by the trial court's remarks, the trial court concluded the victims here were "particularly vulnerable" because they were runaways, homeless and in need of money. Defendant does not challenge the finding of particular vulnerability, nor could he. " '[P]articular vulnerability' is determined in light of the 'total milieu in which the commission of the crime occurred.' " (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1693-1694, disapproved on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123.) A victim's young age together with other circumstances can establish " 'particular vulnerability' " as an aggravating factor. (*Dancer*, at p. 1694.) Here, the other circumstances relied upon by the court made the victims particularly vulnerable.

In any event, the presence of just one aggravating circumstance renders it lawful for the trial court to impose an upper term sentence. (*People v. Black* (2007) 41 Cal.4th 799, 815.) Here, the trial court expressly relied upon the seven circumstances in aggravation listed in the probation report.[10] Thus, even if the court erred in using mere

---

[10] The probation report listed the following aggravating circumstances from California Rules of Court, rule 4.421: "(a)(3) The victims were particularly vulnerable. Both victims were runaways in need of money. [¶] (a)(4) The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission. [¶] (a)(8) The manner in which the crime was carried out indicates planning, sophistication or professionalism. [¶] (b)(2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness. [¶] (b)(3) The defendant has served a prior prison term. [¶] (b)(4) The defendant was on parole and

32

age as an aggravating factor, defendant has not demonstrated prejudice because the trial court appropriately relied on other aggravating factors not challenged by defendant.

## B. Section 654

As the People have noted, the trial court's pronouncement of sentence for counts one, two, and four does not comply with section 654. We exercise our authority to correct that error.

Section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) At sentencing, with regard to counts one, two, and four, the trial court stated: "I think *I will not sentence*. I'm going to stay those pursuant to 654 rather than to sentence." (Italics added.) The trial court's failure to impose a sentence on counts one, two, and four was unauthorized.

It is well settled that when a court determines that a conviction is subject to section 654, it must *impose* a sentence and then stay the *execution* of the duplicative sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed. (*People v. Duff* (2010) 50 Cal.4th 787, 796 (*Duff*); *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 (*Alford*); *People v. Salazar* (1987) 194 Cal.App.3d 634, 640; *People v. Niles* (1964) 227 Cal.App.2d 749, 755-756.) "This procedure ensures that the defendant will not receive 'a windfall of freedom from penal sanction' if the conviction on which the sentence has not been stayed is overturned." (*Salazar*, at p. 640.) The trial court thus imposed an unauthorized sentence by failing first to impose a sentence on counts one, two, and four and then stay execution of those sentences. (*People v.*

---

informal probation when the crimes were committed. [¶] (b)(5) The defendant's prior performance on juvenile probation was unsatisfactory."

*Crabtree* (2009) 169 Cal.App.4th 1293, 1327; see *Alford*, at p. 1472.) As noted by the People, because this constituted an unauthorized sentence, it may be corrected at any time. (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13 [it is well established that the appellate court can correct a legal error resulting in an unauthorized sentence, including a misapplication of § 654, at any time].)

Here, as in *Alford*, we see no reason to remand for resentencing, but will instead exercise our authority to modify the judgment. (§ 1260; *Alford, supra*, 180 Cal.App.4th at p. 1473 [rather than remand for a new sentencing hearing, appellate court imposed the sentence the trial court would have "undoubtedly" imposed].) The trial court made clear its intention to sentence defendant to the upper term on the base term. After recounting the numerous aggravating circumstances involved in this case, the trial court specifically stated, "I think if anyone's earned the upper term, it is this defendant." Accordingly, it is clear that the trial court would have imposed the upper term of eight years on counts one and two, pimping a minor under 16 years of age (§ 266h, subd. (b)(2)), and the upper term of eight years on count four, pandering a minor under 16 years of age (§ 266i, subd. (b)(2)).

Accordingly, on counts one, two, and four, we impose the upper term sentences of eight years, and stay execution of those sentences, the stay to become permanent on the completion of the sentences as to counts seven and eight. (See *Duff, supra,* 50 Cal.4th at p. 796.)

## DISPOSITION

The judgment is modified to: (1) impose upper term sentences of eight years on counts one and two, pimping a minor under 16 years of age (§ 266h, subd. (b)(2)), and stay execution of those sentences pursuant to section 654; and (2) impose an upper term of eight years on count four, pandering a minor under 16 years of age (§ 266i, subd. (b)(2)), and stay execution of that sentence pursuant to section 654. As so modified, the judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

                                                        MURRAY         , J.

We concur:

        RAYE           , P. J.

        HULL           , J.